FRANK HEALY et al., Appellees, v. W. E. GRAY et al.,
Appellants.

ATTORNEY AND CLIENT: Scope of Employment—Implication.
1  The facts and circumstances surrounding a certain subject-matter, and the conduct of an attorney and another with reference thereto, may be amply sufficient to establish the relation of attorney and client with reference to such subject-matter. So held where the relation was held to embrace matters relating not only to an administration, but also to the interest of the heirs in real estate concerning which the administrator had no duty.

ATTORNEY AND CLIENT: Adverse Acquisition of Property. An
2  attorney who avails himself of the knowledge imparted to him by his client, and, without the knowledge or consent of the client, purchases the very subject-matter to which the client is making claim, and which is the subject of the employment, will be held to hold the property in trust for the client.

*Appeal from Calhoun District Court.*—M. E. HUTCHISON,
Judge.

JULY 1, 1918.

SUIT to declare a trust in real property. The facts are fully stated in the opinion.—*Affirmed.*

*S. A. Frick* and *Gray & Gray,* for appellants.

*J. F. Lavender* and *Kenyon, Kelleher, Price & Hanson,* for appellees.

STEVENS, J.—Plaintiffs are the sons and daughters and heirs at law of Charles I. Healy, who died intestate in Calhoun County, Iowa, seized of the NE¼ of the SW¼ of Section 25, Township 87, Range 32, in said county. Prior to and on June 19, 1888, Ada M. Healy, the deceased wife of Charles I. Healy, held the legal title to the N½ of the SE¼ of the section, township, and range aforesaid. All of said real estate was sold at sheriff's sale and, on June 19, 1888, a sheriff's deed, conveying said premises to Isaac Cole, who resided at Sidney, Illinois, was executed. A few days prior thereto, Ada M. and Charles I. Healy conveyed the same to Cole, by quitclaim deed, for an expressed consideration of $1,975. Cole was an uncle of Charles I. Healy's, and he furnished the money and took up the sheriff's certificate of purchase for the evident purpose of preventing the execution of a sheriff's deed to a stranger. The improvements were all on the 40-acre tract, but the Healys continued to occupy and cultivate the whole farm of 120 acres until the death of Charles I. Healy, which occurred about two years after the death of his wife. Cole and wife reconveyed the 40-acre tract to Charles I. Healy in May, 1911, for the expressed consideration of $1.00. Cole paid the Healys nothing for the quitclaim deed executed to him in 1888; but the indebtedness against the land, represented by the certificate of purchase, together with some small items of expense incurred by Cole, amounted to $1,975. During the

1. ATTORNEY AND CLIENT: scope of employment: implication.

first eight years following the execution of the sheriff's deed to Cole, the Healys occupied the premises without paying rent therefor; but thereafter, $200 per year was paid to Cole as rental. Several written leases between the parties were offered in evidence. Cole paid the annual taxes, and also some ditch taxes. The same rent was paid for the 80 after the 40 was reconveyed to the Healys as before.

After the death of Charles I. Healy, and on October 29, 1915, Frank Healy wrote a letter to Isaac Cole, advising him of his father's death and inquiring as to the arrangement regarding the 80-acre tract. Cole replied that he would accept $100 per acre for the land, but made no reference to the title thereto. Prior to the receipt of the letter from Cole, Frank Healy employed appellants, who are attorneys at law, to procure his appointment as administrator for his father's estate. The petition for that purpose was prepared by the junior member of the firm. On the following day, Frank Healy received, and went to the office of appellants with, the Cole letter. This suit was instituted for the purpose of having the legal title to said land, which is held by appellants, decreed to be in trust for plaintiffs, and to require appellants to convey same to them. The court granted the prayer of their petition.

Only Frank Healy and R. C. Gray were present when appellants prepared the petition for his appointment as administrator of his father's estate. Frank Healy testified that he then told R. C. Gray all he knew about the land in controversy, and that he had written a letter to Isaac Cole inquiring what Cole had against it, or what claim he made thereto; and promised to bring his reply to the office, as soon as received. Mr. Gray, according to Healy, said, in reply:

"We will look after that, in time. We can go ahead and fix up the administration papers, and that can be attended to later on."

This conversation is denied by Gray, but Frank also testified to a conversation with W. E. Gray, as follows:

"My first talk was with W. E. Gray, on the street. I told him of father's death, that the children wanted me appointed as administrator, and he says, 'All right, we will fix it up,—you should be.' I told him I wanted him to act as my attorney in the administration. This was probably a week before I was appointed. The next time, I went up into their office."

This conversation also is denied by Gray.

Upon receipt of the letter from Cole, Frank went at once to Rockwell City, where he met R. C. Gray in a restaurant, and gave him the letter. A little later in the evening, he went to appellants' office, where he had a conversation with W. E. Gray, in the presence of the members of the firm, and, appellants claim, in the presence of a client whom they had met at the office by appointment. Frank Healy did not remember definitely whether anyone but the members of the firm was present. The evidence is in conflict as to what occurred on this occasion. Frank testified, in substance, as follows:

"When I received the above letter, I took it to Mr. Gray. I handed it to him, and he read it. He says, 'What are you going to do?' I says, 'I am going to try to get that land back;' and he made a proposition to go in with me and buy it back. I didn't accept it. He says, 'You had better attend to this matter right away: somebody will pick it up.' I says, 'How is it going to get out? Me and my wife and you are the only three that knows it.'"

Upon cross-examination, he stated that W. E. Gray inquired whether the heirs could purchase the land, and that he replied that he did not know until he could see or write to his brothers and sisters; that he would do so, and find out. W. E. Gray, whose testimony is corroborated by the other witnesses present, testified that Frank said:

"I am badly disappointed. I got a letter from Mr. Cole, which shows that father never had any interest in that land."

He further testified that he then suggested to Healy that the proposition looked good to him, and asked him why he did not buy the land; that Healy replied that neither himself nor the rest of the family could buy it; that he then suggested that, if none of them could buy it, he would buy it himself; and that Frank said, "All right."

It should be stated in this connection that the letter from Cole contained no reference whatever to the title to the land, or to Charles I. Healy's interest therein.

The decision of this case turns upon the question whether the relation of attorney and client existed between the parties hereto regarding the subject-matter of the litigation at the time appellants purchased the land, thereby forbidding them to deal therewith for their own benefit and profit. The employment of appellants by Frank Healy to procure his appointment as administrator is conceded by appellants, but they seek to limit the scope thereof to that purpose only. R. C. Gray admits that no list of heirs or real estate was filed at the time of Frank's appointment as administrator, but denies the statement attributed to him by Frank. The record as to the details of the conversation between them is somewhat meagre. No retainer was demanded by Gray, or paid by Healy, nor does it appear that the scope of appellants' employment was in any way discussed. While the relation of attorney and client rests upon contract, it is not necessary that any particular formalities be observed in relation thereto, or that a retainer be demanded or paid. The contract may be implied from the conduct of the parties. *Keenan v. Scott,* 64 W. Va. 137 (61 S. E. 806).

It is not claimed on behalf of appellees that a definite agreement was entered into between them, by which appellants were employed to represent them in any possible liti-

gation between the Healys and Cole affecting the title to the land in question. The only purpose Frank Healy could have had, however, in going with the letter to the office of appellants, was to communicate to them what he had learned concerning the matter, and to consult them as to the better course to pursue. Appellants must have understood, from the beginning, that the Healys believed their father died seized of an interest in the land, and that they were ignorant as to the nature or extent thereof.

Frank testified that W. E. Gray told him, in a conversation before the father's death, that he had urged the latter to have the title to the 80 fixed up. Gray denied this conversation. The conversation on the evening of November 9th, as appears from the testimony of the parties present, related almost entirely to the purchase of the land, except that Frank Healy claims to have stated that he intended trying to get the land back. The price quoted by Cole was $60 to $70 per acre less than the fair market value of the land. Appellees were compelled to rely entirely upon circumstantial evidence, to impeach Cole's title thereto. No definite course of procedure was considered or discussed, except that appellants claim that Frank said it was all right for them to buy the land. That the relation of attorney and client existed between Frank Healy, as administrator, and appellants, at the time in question, admits of no controversy. He probably did not, technically, distinguish between his relation as administrator to the personal and real estate, nor does it appear that he was informed by appellants that, as administrator, he would have nothing to do with the farm. Frank Healy further testified that he procured the appointment of administrator in accordance with an agreement between himself and his brothers and sisters, that he would look after the estate. He evidently understood that appellants would represent him in matters pertaining to

the estate, and doubtless appellants similarly understood the relations between them.

W. E. Gray, upon cross-examination, testified concerning the receipt and retention of the Cole letter as follows:

"We retained the letter from Isaac Cole. Ross put it in the safe. This was regarded as our client's paper, and our client was Frank Healy. We expected Frank Healy to call for it; it was his personal property; that is why we put it in the safe. We regarded it as confidential paper, being our client's paper. I had that letter in my pocket when I went back to Isaac Cole's house. I took with me what I regarded my client's confidential paper to Illinois, when I went on my own personal business. * * * I regarded that letter brought to us by a client for our inspection. I regarded it as a matter brought to us for our advice or best judgment as a lawyer of what should be done."

Appellants advised Healy to purchase the land at the price quoted. They evidently believed that the better course to follow; but they contend that he protested that he could not do so,—that none of the heirs were able to purchase; whereas Frank claims that he told them he would communicate with his brothers and sisters, and find out what could be done. A few days later, he wrote a second letter to Cole, inquiring his best price and terms; but, as W. E. Gray purchased the land the second day after Frank's last visit to the office, no reply was received to this letter. Frank learned of Gray's trip to Illinois and the purchase of the land some time later, upon a visit to appellants' office. It will be observed that the testimony regarding each of the visits of Frank Healy to appellants' office is very conflicting; but we entertain no doubt that Frank Healy believed and understood that, when he gave the letter to R. C. Gray, the firm was acting for him in all matters pertaining to the estate of his father, and that he looked to them, with their full consent, for advice. If appellants desired a more definite under-

standing, or contract, as to the extent and scope of their employment, they should have so informed Healy. The duty of an attorney to render faithful and honest service to his client is, of course, conceded by appellants. The relation is in the highest degree confidential, and a client does not assume any risk in communicating freely with his attorneys concerning the subject-matter of the employment. It was said by this court, in *Polson v. Young*, 37 Iowa 196:

"Transactions between attorney and client, as in all other cases where fiduciary relations exist between parties, one of whom possesses superior knowledge and ability and the other is subject to his influence, are regarded with a scrutinizing and jealous eye by courts of equity, and will be set aside, and the clients protected, whenever advantage has been taken of them through the influence or knowledge of the attorneys, possessed by reason of their peculiar relations."

To the same effect, see *Donaldson v. Eaton & Estes*, 136 Iowa 650; *Shropshire v. Ryan*, 111 Iowa 677; *State v. Johnson*, 149 Iowa 462.

The supreme court of Alabama, in *Singo v. Brainard*, 173 Ala. 64 (55 So. 603, 604), said:

"It can be safely stated, as a sound and salutary legal principle, that, so long as the relationship of client and attorney exists, the attorney is a trustee for his client in and about the cause or the subject thereof; and any trade that he makes or benefits he may derive, resulting from the litigation or a sale of the subject of the litigation, will inure to the benefit of the client, the *cestui que trust*. This is a rule so wholesome and just that citation of authority is needless, and it would be difficult to find an authority holding to the contrary."

*Cunningham v. Jones*, 37 Kan. 477 (15 Pac. 572); *United States O. & L. Co. v. Bell*, 153 Cal. 781 (96 Pac. 901); *Taylor v. Barker*, 30 S. C. 238 (9 S. E. 115); *Cline v. Charles*,

(Ky.) 124 S. W. 347; *Sutherland v. Reeve,* 151 Ill. 384 (38 N. E. 130) ; *Henyan v. Trevino,* (Tex.) 137 S. W. 458; *Home Inv. Co. v. Strange,* (Tex.) 152 S. W. 510; *Carson v. Fogg,* 34 Wash. 448 (76 Pac. 112).

It is also a general rule that an attorney will not be permitted to make use to his own advantage or profit, of knowledge or information acquired by him through his professional relations with his client, or in the conduct of his client's business. *Larey v. Baker,* 86 Ga. 468 (12 S. E. 684) ; *Home Inv. Co v. Strange,* supra; *Carson v. Fogg,* supra.

The duty of an attorney to his clients is one of great delicacy and responsibility, and, sometimes, of apparent hardship. Every consideration of personal advantage or profit must be subordinated to the interest

**2. ATTORNEY AND CLIENT: adverse acquisition of property.** and welfare of the client, and information derived from the close and intimate relationship necessarily existing should not be used to promote personal interests, or for personal gain.

The technical distinction between appellants' employment to represent Frank Healy, who had also assumed, as administrator, to ascertain the situation as to the title to the tract in question, in which the family believed deceased had an interest, and their employment for the specific purpose of representing the heirs of Charles I. Healy, in possible or prospective litigation between them and Cole, should not be given controlling importance. But for their employment by Frank Healy, he would not have gone to their offices on the evening of November 9th with the Cole letter, nor given them an opportunity to purchase the land at a price much less than it was fairly worth, and thereby obtain the advantage complained of. An implied understanding and agreement that the employment of appellants to represent Frank Healy and whoever might necessarily become a party to the adjustment of the title, may be inferred from the circumstances and conduct of the parties. Frank under-

stood them to be, and treated them as, his attorneys. They received, acknowledged, and treated Frank as their client. The information upon which they acted in buying the land was imparted to them because of this relationship. It is not material that the facts upon which the Healys based some claim to an interest in the land were not gone into in detail, or that he inquired as to the probable legal or equitable effect thereof. Appellants, in argument, emphasize their claim that Frank Healy told them it would be all right to buy the land. The latter, however, denies this; and it is not quite consistent with the course pursued by Frank three days later, in writing to Cole inquiring as to the best price and terms upon which the land could be purchased.

Upon the trial of the case below, counsel for appellees sought to show that Charles I. Healy was, in fact, the owner of the equitable title to the land, and that Cole held the legal title as security for the payment of the money advanced at the time he obtained the sheriff's deed. From the evidence, it appears that the sheriff's deed, together with the quitclaim from Ada M. and Charles I. Healy, conveyed 120 acres to him; that, many years later, he reconveyed 40 acres thereof to Charles Healy, without substantial consideration; that the same rent was paid for the 80, after the reconveyance of the 40, as before; that Cole seldom, if ever, visited the land, never gave direction for its cultivation or upkeep; and that Healy had the full management and control thereof. No explanation was offered by Cole, although his deposition was taken, of the transaction by which he reconveyed the 40 acres to Charles I. Healy, without substantial consideration. This tract formed the homestead of the Healys.

We are not called upon to decide the question whether Charles I. or Ada M. Healy died seized of an equitable interest in the land in question, as that question is not of controlling importance. On the day following Frank's visit to the office of appellants, to consult them about the Cole letter,

W. E. Gray went to Illinois, without the knowledge of Frank Healy, and purchased the land from Cole for $8,000, the price fixed in the letter. He, of course, knew at the time that whatever claim the Healy heirs should assert to the land would be adverse to any interest acquired by purchase from Cole. The law does not permit members of the legal profession to thus deal with the property of their clients, or property in which some interest is asserted by them, and which may become the subject of litigation; or to employ or use information derived from clients during the course of their employment, relating to the subject-matter thereof, to their own advantage. It may be that appellants believed that the Healy heirs could not produce sufficient evidence to establish the Cole deed as a mortgage, held as security for the payment of the money advanced, to prevent the execution of a sheriff's deed to a stranger, or to in any way overcome Cole's apparent title to the land; and that litigation was unlikely to follow. It is true that none of appellees, except Frank Healy, at any time consulted with appellants respecting their father's estate, or directly employed them in litigation to which they would be necessary parties; but the information upon which appellants acted in purchasing the land affected their interests therein, the same as Frank's. In writing to Cole, he acted in behalf of all of the heirs and their father's estate, and in pursuance of an understanding between them. The scope of appellants' employment was doubtless intended to embrace all matters affecting the property of Charles I. Healy; and the land in question was the subject of inquiry and investigation, concerning which Frank Healy consulted appellants and received their advice.

We have not overlooked appellant's claim that he purchased the land with the consent of Frank Healy, nor have we failed to give proper weight and consideration thereto; but the circumstances surrounding the transaction, together with the admitted relation of the parties, appeals strongly

to the equitable jurisdiction of the court. The decree of the court below covered all the material points, was full and complete, and fully protects the interests of appellants. It is, therefore,—*Affirmed.*

PRESTON, C. J., WEAVER and GAYNOR, JJ., concur.