IN RE McDONALD.

(No. 7,979.)

(Submitted January 20, 1941.   Decided May 29, 1941.)

[113 Pac. (2d) 790.]

130

*Messrs. McCaffery & McCaffery* and *Mr. J. D. Taylor,* for accused, submitted a brief; *Mr. J. J. McCaffery, Sr.,* and *Mr. Taylor* argued the cause orally.

*Mr. Walter Aitken,* special prosecutor, submitted a brief, and argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

This is a disbarment proceeding brought by Mrs. Ike Sanders by sworn complaint shortly before her death. The court appointed the Honorable C. E. Comer, then a practicing member of the Montana Bar, to make an investigation. He recommended prosecution but withdrew on account of his appointment as a District Judge of the Fourth Judicial District. The Honorable W. T. Pigott and the Honorable Walter Aitken, practicing members of the Montana Bar, were then appointed Referee and

Special Prosecutor, respectively, and the latter thereafter filed an amended complaint. The charge is that the accused was guilty of deceit and fraud practiced on a client.

There are two specifications relating respectively to the transactions involved in causes Nos. 8086 and 8137, *Sanders* v. *McDonald* and *Sanders* v. *Lucas* and *McDonald,* 111 Mont. 599, 111 Pac. (2d) 1041, and 111 Mont. 604, 111 Pac. (2d) 1043. For further particulars, reference is made to the opinions in those cases.

The first specification relates to the action of the accused in obtaining a deed in his wife's name for Mrs. Sanders' undivided two-thirds interest in two sections of land under the circumstances described in cause No. 8086. The second relates to his action in obtaining in his own name the option on the Lucas one-third interest in the same lands under the circumstances described in cause No. 8137.

The answer places in issue the material allegations and admits that the accused claims to be the owner of the full legal and equitable title to the undivided two-thirds interest under the deed, and also to be the beneficial owner of the option for the Lucas one-third interest.

The judgment rolls in the two cases were admitted without objection as to the material portions, which are agreed to include the evidence given at the trials and the depositions of the accused and his wife. The unsworn statement of Mrs. Sanders was excluded, but the accused quotes portions of it in his briefs. Certain oral testimony was heard by the Referee, including that of the accused, his wife and Wilbur Sanders, Mrs. Sanders' son.

In his report the Referee made under the heading "Memoranda" a general statement of the evidence in which he said with reference to the first specification:

"The Accused testified that in the autumn of 1932 or spring of 1933, soon after settlement of her husband's estate, Mrs. Sanders asked him what he would charge to attend to her legal affairs, and that he said he would gladly do so for a retainer of $500.00 a year. She did not in words accept the offer, but ex-

pressed no dissent, and that for more than five years she consulted him upon legal matters, many times, 'I would say fifteen or twenty times a year. No, I am not sure' whether it was fifteen or twenty times. No other person was present when the agreement was made; no memorandum was made of it, nor did he even send her a bill. By word of mouth he had asked for payment, but upon her plea of lack of money, he did not press for payment, even on account. He testified that he kept no books at all for entry of charges for professional services; all he kept or had was a record of cash received and cash paid out, and check stubs. During the five and a half or six years of service, nothing was paid on the $500.00 yearly retainer. Taking at full face value his testimony in respect of the services and their value, and giving him the benefit of any doubt, the fact is established that the matters upon which she consulted him 'fifteen or twenty times a year' were, without exception, so far as he disclosed, of small importance and of little, if indeed any, difficulty. Many of them are almost trifling in character; most of them were routine and simple, requiring a minimum of time and legal knowledge. The Referee thinks that the value of the services did not exceed an average of $60.00 to $80.00 a year, or a total of $300.00 or $400.00 for the five-year period. Notwithstanding the circumstances which were so unusual and peculiar as to cast doubt upon his testimony that such an agreement was made,—despite such of his conduct and statements as tend to show that the minds of the Accused and Mrs. Sanders did not meet,—the Referee, upon consideration of all the evidence adduced, after long hesitation has arrived at the conclusion that he should not find that the agreement was not entered into. To find otherwise would be tantamount to the direct charge of flagrant perjury by the Accused; this, the Referee thinks, would not be justified by the evidence before him. But this conclusion does not preclude further inquiry with respect to the agreement. Such inquiry is demanded by law, as well as by the sanctions of morality. * * *

"The agreement as to the Accused's compensation for services which might be rendered in the future was neither fair nor

reasonable to the client. The duty of her trusted counsel and fiduciary was clear; it was to name or suggest a compensation which, in view of all the conditions and circumstances known to him, would, in his unbiased and honest judgment, be reasonably proportionate to the worth of the services he anticipated might or probably would be required. Instead of discharging that duty, he violated it by naming, and securing an agreement for, compensation so grossly disproportionate to the value of the services he had any reason to think might be required as to be exorbitant. It bears the imprint of undue influence. It is pregnant of evidence that advantage was taken of the client. His client's holdings were of very modest value; his long experience as the attorney for her husband and herself had made him familiar with what services they had required in legal matters, and he knew that they had been comparatively few and not of great moment or value. He had no reason to believe that Mrs. Sanders would require in the future the rendition of more, or substantially more important or difficult, services than those theretofore performed. There were no pending law suits, nor threat thereof, nor were difficulties apprehended. The yearly fee was a sum equal to about five per cent. of the gross value of her worldly possessions. And it was equally his duty thereafter to charge less than the agreed amount whenever the value of his services fell substantially below it. This duty, also, was not discharged. It was, and continues to be, defiantly flouted and persistently violated. When he became aware, as he did, that his services were or had been reasonably worth—that is, he had earned—some sixty to eighty dollars (or less) a year, his duty was so clearly apparent that it need not be stated. * * *

''The incontinent eagerness of the Accused to acquire for a consideration, asserted by him to have been $2,500.00 (but which in fact did not, the Referee thinks, exceed $400.00), his client's property which he believed fairly and reasonably worth $36,000.00 at the least, excluded an equal or similar avidity to serve his client by preventing a purchase by A. M. MacDonald

from her of the same property at an inadequate price. If his testimony alone be considered, the fact is revealed that his major objective was his own enrichment at the expense of his client. His greediness, his avidity for the greater share of the newly discovered wealth on Section 1 caused him to violate his duty as fiduciary. His minor objective and intent was doubtless to serve his client by taking title in himself, thereby preventing her from selling to A. M. MacDonald. Yet his minor purpose and objective was well-nigh lost sight of and figuratively submerged. His promise to sell the two-thirds 'back to her whenever a fair price is offered', and other promises of like import, including 'I said I would sell it back to her, maybe, some day', are all and singular illusory, meaning just nothing when the fact appears that the premises were qualified by the condition precedent to any such sale, which was that he and his client (or her successors in interest) must be of one mind— must agree—as to what shall be considered a fair price, thus leaving to him the right at pleasure to reject any offer at any price, whether made by the client or any one whomsoever, and keep the property as his own absolutely. It would be indeed difficult to imagine promises of less substance. The Accused repeatedly testified that the only consideration for the deed was the past due debt of $2,500.00; if that be true, then there was nothing to support the promises, and each was a *nudum pactum*. This is manifest. Furthermore, the statute of frauds denounces as void every such oral promise, even when there was an adequate consideration for it.

"From any point of view, the promises to permit Mrs. Sanders or her successors in interest to 'buy back' the property at a price to be agreed on as 'fair', were so barren of substance as to be diaphanous. They were full of words which signified nothing in the law.

"By procuring from his client, in the circumstances disclosed by the evidence, a grant of property believed by him to be worth many thousands of dollars more than the consideration,

the value of which he grossly exaggerated, the Accused was guilty of malpractice involving moral turpitude."

With reference to the second specification, the Referee's statement of facts, under the heading "Memoranda," stated:

"While the testimony of Wilbur Sanders and of Lucas strongly support the charge, the circumstantial evidence, and especially and particularly the testimony of Mr. S. P. Wilson (who was not a witness in either Action No. 2165 or Action No. 2168, now Nos. 8086 and 8137 in this court) are of a character and quality of proof which prevent the Referee from being satisfied as to a reasonable certainty of the truth of the charge. The Referee must find for the Accused on the charge made in Specification 2."

The Referee then proceeded to make "Findings of Fact which are intended to be considered with the foregoing Memoranda," including the following:

"On the charges of Specification No. 1, the Referee finds: * * * That in the autumn of 1932 or the spring of 1933, the Accused and one Johanna Sanders, widow of one Ike Sanders, and commonly called Mrs. Ike Sanders, orally agreed that she would pay him a fee, or compensation, of $500.00 a year for attending to such of her affairs as might require the services of a lawyer; that at the time the agreement was made, the Accused was, for many years immediately theretofore had been, and continued to be until on or about October 17, 1938, the only attorney and counsel or legal adviser of Mrs. Sanders; that she at all times reposed implicit confidence in him.

"That the oral agreement mentioned was not fair or just to Mrs. Sanders, the client of the Accused, in this: That the fee, or compensation, of $500.00 per annum was greatly in excess of the services which the Accused had any reason to anticipate would be required of him; and that the Accused did not believe that such services would be worth that sum or any sum approximating it. That the amount stipulated was exorbitant; that the client was induced to agree by his undue influence as her counsel.

"That the reasonable value of the services rendered by the Accused from the time the agreement was made to October 8, 1938, did not exceed the sum of $400.00, as the Accused should have known. * * *

"That the promises he made were intended to be performed, if possible, but that they were without consideration, and also so indefinite and vague as to be not enforcible at law or in equity.

"On the charges of Specification No. 2, the Referee finds:

"That the Accused did not advise Mrs. Sanders, his client, that he should go to California, or any other place, and endeavor to purchase for her the Lucas one-third undivided interest in Sections 1 and 31 mentioned in the Specification, or in either of the sections; that she requested him to go to California to purchase the Lucas interest for himself, not for her; that her request was freely and voluntarily made, without undue influence by the Accused, and after he had fully and fairly imparted to her all the information possessed by him in the premises; that the $50.00 she entrusted to him upon his leaving for California on October 9, 1938, was intended by her to be used for the expenses of Wilbur Sanders, her son, and was so used by the Accused; that he obtained the option in his own name in pursuance of her request that he acquire such title for himself; that he did not represent to Lucas that the option contract was for the use or benefit of Mrs. Sanders."

The Referee's conclusions of law and his recommendations are as follows:

"1. That in the making of the oral agreement of 1932 or 1933, subsequently asserting and charging the fee, or compensation, of $2,500.00, whereas he knew it to be exorbitant, and acquiring the deed of October 8, 1938, all considered together as a whole, his conduct was unethical; that therein he was guilty of malpractice involving moral turpitude.

"2. That the Accused is not guilty of any malpractice, deceit, or other wrong-doing charged in Specification No. 2; and that

the allegations of fraud, malpractice, deceit, or other misconduct therein, are not true.

"Recommendations.

"It is recommended that the Accused be suspended from practicing in this Court for the period of three months, and that he pay such part of the expenses of this proceeding as the Court in its discretion may deem proper."

The special prosecutor has moved the court to reject the Referee's findings favorable to the accused under both specifications, and also the Referee's recommendation that the accused be merely suspended for three months; while the accused has moved that the findings and conclusions favorable to him be accepted, and those unfavorable and the recommendation of suspension rejected.

The first question raised is upon the attempt of the accused ▇▇ to prove that Mrs. Sanders was mentally incompetent when the original complaint was made. However, the Referee properly excluded such evidence as immaterial, since the complaint had become *functus officio* upon the filing of the amended complaint, and since in any event this court has power to take action to discipline its officers (*In re Hansen,* 101 Mont. 490, 54 Pac. (2d) 882), even though there might be some doubt as to the sanity of the person making the original complaint.

The next question, and the chief one, concerns the adoption ▇▇ or rejection of the Referee's findings of fact and conclusions of law. It has been held that the findings of the Referee are conclusive if supported by substantial testimony, but that his conclusions of law are dependent on their soundness in law and the sufficiency of the findings and evidence to support them. (*In re McCue,* 80 Mont. 537, 261 Pac. 341.)

There is substantial testimony in the record to support the ▇▇ Referee's findings and conclusions as to the second specification, that relating to the Lucas option of his undivided one-third interest in the land. Accordingly those findings and conclusions must be sustained even though in our opinion the evidence preponderates to the contrary.

In that connection it may be well to analyze the question briefly. Mrs. Sanders, with only an undivided two-thirds interest, had purported to lease the entire interest in a portion of these lands, and the one who had purchased the lease for $36,000, of which $3,000 had already been paid, was naturally upset upon learning the facts and had complained strenuously to Mrs. Sanders about it. The prosecution contends that the sole purpose in acquiring the Lucas option was to protect Mrs. Sanders in the premises and the accused admits that that was one purpose. The latter explains his action by saying that someone unfriendly to Mrs. Sanders might, on acquiring the one-third interest, sue her for leasing what she did not own, and that he had assured her that if he acquired the interest he would not sue her. But what she needed was not protection against the owner of the undivided one-third interest, for she had done him little, if any, wrong, but against those to whom she had purported to lease what she did not own. Obviously the only way to protect her was by acquiring for her the outstanding interest so as to make good her lease in full, as the accused well knew; for in cause No. 8086 he said that when he obtained the deed from Mrs. Sanders, "she stated that A. M. MacDonald had been there and threatened to send her to the penitentiary for leasing an entire interest in the part of section 1 when she only owned a two-thirds interest and that she was doing wrong in leasing something she didn't own and I told her then it was quite important that she should acquire the remaining one-third interest from Lucas and she told us when we left there that she would be in town later that afternoon, and would see about it." He added: "Later on in the afternoon she came into town and I told her it was quite important she should buy the remaining one-third interest owned by John J. Lucas and she told me she couldn't possibly buy it as she had no money and was unable to buy it and I suggested to her she borrow the money and she didn't want to do that. I then told her I would buy it or try and buy it and she said she wished I would and I assured her at that time if I did I wouldn't bring suit or send

her to the penitentiary for leasing the one-third interest she didn't own. She then stated she wished I would buy it.''

Obviously upon his own testimony, if Mrs. Sanders ever assented to his buying the interest she did so because she was unable or unwilling to buy it and because he had misled her as to the nature of the protection she needed. But the only way he could have protected her would have been to make an agreement that if he purchased the interest he would in some way subject it to her lease so as to remove the lessee's just complaint. But he makes no suggestion of such an agreement and his acquisition of the interest could have afforded her no enforceable protection. Furthermore, Mrs. Sanders and Wilbur owned apparently unincumbered property worth approximately $10,000, exclusive of her two-thirds interest in these two sections which she had bought for $2,500 before gold was discovered, and she had already in two or three months received $400 in royalties under the lease. It is inconceivable that under these circumstances she would have been unable to raise the necessary money, and he would have helped her to do so if he were honestly working for her interests. It is equally inconceivable that if Mrs. Sanders had been properly advised she would not have been willing to buy the interest for any reasonable amount, both to protect herself with reference to the lease and to have the balance of the property for her own benefit; and according to the accused, she had been trying for one and a half years to find Lucas so as to purchase the interest. It is true that they did not know then that the Lucas interest could be had for $1,000. But the accused testified that when he went to California he expected to obtain it for only about $200. We can, therefore, not agree with the Referee that the evidence preponderates in favor of the accused on the second specification, although we cannot say that there is no substantial evidence to sustain his findings and must, therefore, accept them and the conclusions based thereon.

However, as to the first specification, we must reject the Referee's findings to the effect that there was an agree-

ment for a $500 annual retainer, and that the accused's sole misconduct was in making an exorbitant charge. True, as quoted above, the accused did testify that when he stated the amount his client made no objection, and that he proceeded to furnish her with legal services when she requested them. But we cannot accept those statements as showing an express or implied agreement for the retainer, taking all his testimony as a whole. The testimony of the accused in his deposition was as follows (omitting quotation marks except at beginning and ending) :

"Did you have an agreement with Mrs. Sanders that she would pay you $500 annually? No. You had no agreement with her? Excepting that I told her that my annual charge would be—at various times I told her that my annual charge would be $500 a year. * * * Well, if there was no service, would you still make the annual charge of $500? Oh, yes, sure. Notwithstanding that you don't remember ever having any agreement with Mrs. Sanders to pay you that amount? Oh, yes; there was an implied agreement there. I told her what my charge was, and that seemed to be satisfactory. When did you tell her that? I don't just recall. * * * Where did you tell her that? Well, I don't recall. I think it was in my office. Who was present? I was present and Mrs. Sanders was present. Was anybody else present? I don't know. * * * When did you have this agreement with Mrs. Sanders that you would work for $500 annually? Well, I don't recall just when that was. Was it in 1932, 1933, 1934, 1935, 1936, 1937 or 1938? I don't recall. It might have been in 1938? Well, I wouldn't say. It was further back than that. How much further back than that? Oh, I would say it was during the fall of 1932 or the spring of 1933. Where was this agreement entered into? I think it was in my office. You think it was in your office? Do you know? No, I wouldn't say. Was the agreement in writing? No. Did you make any entry in your book that shows that agreement? No. What did Mrs. Sanders say to you that led you to believe that you could make an annual

charge against her of $500? Well, it was all right. She said
it was all right? Yes. In the fall of 1932 did you say to Mrs.
Sanders, 'I am going to charge you $500 every year for looking
after your legal .business?' Oh, I wouldn't say that those were
the words that were used. What did you say to her? Well, I
don't recall. But you recall that she said that was all right?
I recall that that was agreeable. Her actions and conduct
showed that that was agreeable. What was there in her actions
and conduct that indicated to you that she agreed to give you
$500 a year, whether you performed any services or not? Well,
I told her what my charge was, and there was no objections to
it. Just tell what you said and what she said. I don't recall
what I said. I probably said, my charge for services was $500
a year. Did you say that to her? I wouldn't say those were
the words spoken, but that was the substance of my statement.
What did she say that indicated that was satisfactory? She
didn't say anything to the contrary. She didn't say, then, that
that would be all right? I don't recall just what she said. It
was something about her physical actions that convinced you it
was all right? I wouldn't say it was her physical actions; but
I told her what my charge was and she made no resistance to
it and didn't complain. How many times did Mrs. Sanders
consult you in the year 1937? I don't remember. You don't
know whether it was one, two or three or four times? No.
What do you charge per call for a client who comes into your
office? Well, it depends on the nature of the call, entirely.
Well, such visits as Mrs. Sanders made? Say she came in and
consulted you about such a matter, what would be your charge?
Well, $500 a year.''

His testimony at the trial was as follows: That late in 1932
or early in 1933 ''she came and asked me if I would represent
her in any matters that she might have and I told her that I
would and she asked me what I would charge and I told her
my charge for representing her and taking care of her inter-
ests and refraining from having law suits brought against her
would be $500.00 a year. * * * Mr. McDonald, will you

first tell me when it was that you had an agreement with Mrs. Ike Sanders in reference to her retaining you at a rate of $500.00 a year and what was said at that time and where? Well, I don't know that I can give you the exact date but it was shortly after the closing of the estate of Ike Sanders and about the latter part of 1932 or early part of 1933. Where did the agreement take place? In my office in Philipsburg. Tell us what was said at that time and place? As near as I can recall, she asked me if I would take care of her legal matters and do what legal work needed to be done and take care of her business affairs and I told her that I would. She asked me how much I would charge and I told her $500.00 a year. Did she agree? She said either that's all right or that's satisfactory or acknowledged it was agreeable in some fashion. I don't recall the exact words spoken. But there was an agreement between you and Mrs. Ike Sanders for you to be retained as her attorney on a yearly basis of $500.00 a year at that time? Yes. * * * Referring back to what we were talking about a while ago and your testimony on page 10 in which you were asked, did you have an agreement with Mrs. Sanders that she would pay you $500 annually? Answer: 'No.' Now is that answer correct? There was no agreement in writing. I meant partly I had no agreement in writing.''

He testified that he had never sent her a bill for his services and kept no record of them, and although he was questioned at length he could recall only a few trivial services and could not state positively when most of them were performed, though he did testify generally that Mrs. Sanders consulted him several times each year. The only litigation he could mention was the suit for one-third of the $578 taxes paid by Mrs. Sanders' predecessors, which was prepared the day before he left for California and was filed the next day, apparently to tie up the Lucas interest until an option could be negotiated.

Taking all of his testimony together, it is impossible to construe it as showing either an express or an implied agreement by Mrs. Sanders to pay him $500 per year as a retainer, and by

no stretch of the imagination can it be construed as showing such an agreement to pay him that amount for each year whether he performed any services during that year or not. Consequently, without reference to the other evidence and to the circumstances, some of which are recounted in our decision in cause 8086, we cannot find that there is any substantial evidence of an agreement by Mrs. Sanders to pay the accused a retainer of $500 per year, or that she owed him $2,500 on October 8, 1938; and that is true whether the existence of the alleged retainer agreement is considered as a matter of fact or of law.

If there were any substantial evidence on these points we might possibly have to accept the finding that the deed was taken in consideration of the $2,500, on McDonald's unsatisfactory testimony to that effect notwithstanding the great weight of evidence and all of the probabilities are to the contrary. But it is agreed by all, including accused, that at least one reason for taking the deed was to protect Mrs. Sanders. He himself testified that he took it partly to protect her in compliance with virtually a deathbed request by her husband. How he carried out his promise the record of these three proceedings discloses. His explanation is that he took the deed partly to defeat Mrs. Sanders' prior option of one of the two sections to one A. M. MacDonald for $2,500, the same price, but retaining a twenty-five year grazing lease, of the existence of which option he was informed. He does not explain how a deed taken with such knowledge, even if for a new valuable consideration, could have defeated the option nor why it should have included both sections. And if his deed were effective for that purpose, the only way in which Mrs. Sanders' interests could have been protected would be by giving her some kind of a written agreement to reconvey under certain circumstances. As the learned Referee well states, the alleged oral understanding that Mrs. Sanders might buy back the property at a price to be mutually agreed upon between accused and Mrs. Sanders as fair was "so barren of substance as to signify nothing in the law," and "so indefinite and vague as not to be enforcible at law or in equity."

His conflicting statements show how worthless the alleged agreement was; he would sell back if $36,000 were offered Mrs. Sanders for the interest; he would sell back for $2,500; he would sell back for the $2,500 plus the cost of the two suits against him. It would be pointless to recount the evidence further except to refer to his own statement, doubtless inadvertently made, in his deposition of November 17, 1938, within six weeks after the incident in question: "Now, Mr. McDonald, you say that she wanted you to buy the one-third interest in the land? Yes. So she had an interest in your going to California to the extent, then, that you would buy the one-third interest? Yes. *That would make you a co-owner with her, she holding the other two-thirds interest?* Yes." In view of that admission, made after the execution of Mrs. Sanders' deed to him, that she owned a two-thirds interest in the land, it is impossible to consider his testimony, taken as a whole, to constitute any evidence that the deed vested title in him even if a $2,500 indebtedness to him had been proven. The most that it could tend to prove is that she was in some way obligated to pay the $2,500 before demanding a reconveyance of the legal title; but accused neither makes such claim nor offers to make reconveyance upon that condition.

The accused has had the benefit of the trial of the two civil suits before two careful and competent district judges, and of reviews thereof by this court. We have examined the records in those cases and in this proceeding, in the hope that the accusations might be found groundless or at least that some mitigating circumstances would appear. However, our examination has only confirmed the conclusions of the two district judges and of the two members of the Bar appointed to investigate and prosecute this proceeding, and we can find no circumstances in mitigation of the accused's conduct.

We shall not comment upon the accused's assumption that legal ethics justify or his duty to his client requires the attempted defeat of a prior option by such means as by his own testimony he claims to have employed, except to note that if the

option was obtained improperly or upon unconscionable terms, the proper remedy was hardly to defeat it by an admittedly qualified conveyance to one informed of the option. Nor shall we discuss the propriety of his authenticating as notary public a deed which he claims conveyed title to another in trust for himself. But neither point would seem to disclose that precise respect for propriety which strict legal ethics demand.

The conclusion seems inescapable that the accused formulated and prosecuted a deliberate plan to defraud his client, and that he persisted in his enterprise to the end. Even if his testimony were to be believed, it would indicate a project to defeat a prior option by means of a deed which under the circumstances could not defeat it, and in a way which in any event could never inure to the benefit of Mrs. Sanders or her successors; for no enforceable way was provided for reclaiming legal title, and the accused has made no shadow of an offer to do equity.

It is not the purpose of disbarment proceedings to punish but merely to protect the public, the courts and the profession (*In re Hansen*, supra), and absolute disbarment is ordered only when necessary for those purposes (*In re Peters*, 73 Mont. 284, 235 Pac. 772); but in this instance we are forced to conclude that only absolute disbarment will attain those ends.

Under the circumstances, we feel that we have no alternative but to reject the findings and conclusions of the Referee as to the first specification, and also his recommendation as to punishment. It is, therefore, the finding and judgment of this court that the first specification has been proven in full and that the accused, J. J. McDonald, be and he is hereby ordered disbarred and his name removed from the list of persons entitled to practice law as members of the Bar of the State of Montana.

ASSOCIATE JUSTICES ANGSTMAN, ERICKSON, ANDERSON and MORRIS concur.

Rehearing denied June 10, 1941.