The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

Leo M. BAKER, Respondent.

No. 62159.

Supreme Court of Iowa.

Aug. 30, 1978.

Lee H. Gaudineer, Jr., Des Moines, for complainant.

Edward J. Gallagher, Jr., Waterloo, for respondent.

McCORMICK, Justice.

In this lawyer disciplinary proceeding we review the report of our grievance commission recommending that respondent Leo M. Baker be disbarred for ethical violations arising from his purchase and resale of a farm from an estate being probated by his law firm. Baker accepts the recommendation of disbarment and tenders his license to practice law. We hold disbarment is warranted and therefore revoke the license.

The essential facts justifying disciplinary action are undisputed. Baker was a member of a professional corporation, Sindlinger & Baker, P. C., which in turn was partner in the Cedar Falls law firm of Reed, Merner, Sindlinger, Baker & Sabbath. The other lawyer in the professional corporation was W. W. Sindlinger, with whom Baker had practiced for many years.

In 1975 Sindlinger was co-conservator with Audrey Zieger of the property of Nettie Miller, a 95-year-old aunt of Zeiger. His law firm represented the conservators. The principal asset of the conservatorship was a 278.5-acre Black Hawk County farm, rented by the conservatorship to an 80-year-old tenant upon terms substantially below the

prevailing rate. The conservatorship had $24,000 in liquid assets, but the principal was being reduced $3000 to $4000 annually by expenses for care of the ward.

Wayne Mark, a local real estate investor, owned a corporation with Sindlinger called "Vi-Vim" which bought and sold farms for investment purposes. Sindlinger did the legal work for Mark and Vi-Vim. Baker acquired one-half of Sindlinger's interest in Vi-Vim prior to the events which are material here. Mark had attempted unsuccessfully over a period of several years to purchase the Miller farm, first from Nettie Miller and later from Zeiger. In the spring of 1975 Mark made an oral offer to Zeiger through Sindlinger for Vi-Vim to purchase the farm for $200,000. Zeiger had refused to deal with Mark. Sindlinger submitted the offer without disclosing his or Mark's interest. Zeiger rejected it as too low.

In June 1975 Mark and Sindlinger decided to offer $250,000 for a contract purchase of the farm. This amounted to slightly less than $900 per acre. Without revealing the identity of the purchaser, Sindlinger submitted the new oral offer to Zeiger with his recommendation it be accepted, and she agreed to sell at that price. Although Sindlinger informed Baker of the purchase, he did not then tell him he was a co-conservator or that the conservatorship was a client of the law firm. Baker asserts he did not learn of this relationship until December 1975. Sindlinger did tell Baker that Zeiger would not sell the farm to Mark. Baker offered the name of R. E. Doerfer, an entrepreneur who shared offices with Baker, as a nominee to carry out the purchase.

Baker or his secretary obtained the signature of Doerfer on a written offer prepared by Sindlinger which was dated July 12, 1975, and directed to Zeiger and Sindlinger as co-conservators. Zeiger and Sindlinger signed the acceptance.

Although he contends he did not make the connection, Baker later signed the conservatorship's notice of termination of tenancy which was served on the farm tenant. A neighboring farmer subsequently called Baker and asked if the farm was for sale.

Baker said he would check with Sindlinger and let him know. He called the farmer back and told him the farm had been sold.

Court approval of the sale with waiver of appraisal was obtained by Sindlinger on December 12, 1975, without disclosing to the court or guardian-ad-litem the self-dealing involved.

The ward died on December 17, 1975, before execution of the contract of sale. Sindlinger discussed those events with Baker, and Baker said he thus learned for the first time that the seller was a conservatorship represented by his law firm. Nevertheless he neither said nor did anything about it. Instead he talked with Sindlinger about the tax advantage in selling the farm in the estate rather than the conservatorship. Zeiger became executor of the estate with power of sale under Nettie Miller's will. With Sindlinger's assistance the sale was completed in the estate proceeding in January 1976 on the same terms as agreed upon in July 1975, despite an intervening increase in farm values of which the attorneys were aware. Vi-Vim had sold a farm in late 1975 for approximately $2100 per acre.

Sindlinger, Mark and Baker agreed in January 1976 that Baker would receive one-third of any profit realized on resale of the Miller farm. Baker borrowed $50,000 which he furnished to Sindlinger for the initial contract payment. Sindlinger leased the farm for the 1976 crop year for $22,950 or one-half the net on crops, whichever was greater. This rental was approximately four times the amount which the conservatorship had received from the prior tenant. The first rental payment of $11,425 was transferred to Baker who applied it to his $50,000 loan. The rent was more than enough to cover the annual principal and interest payments on the contract.

Aware of a continued increase in farm values, Baker decided later in 1976 to sell the farm. Pretending to be acting for Doerfer, he engaged a realtor to seek a buyer. In December 1976, two neighbors submitted identical bids of $2200 per acre through the realtor. Baker countered with

an offer to take $2600. Bidder Vernon Luhring consulted his attorney, LeRoy Redfern of Cedar Falls, who contacted Baker. He was assured by Baker that the other bidder was serious and Doerfer would not take less than $2600 per acre. Luhring agreed to the purchase at that price, almost three times the amount Baker and his colleagues had paid the Miller estate for the farm at the beginning of the year. At Baker's request Luhring paid $25,000 earnest money.

Baker caused the abstract to be continued to date for examination by Redfern. Although a memorandum of sale had been filed, the Doerfer contract had not been recorded. One of Redfern's title requirements was that the contract be shown of record. This was done April 4, 1977, one week before the scheduled closing of the transaction. When Redfern saw the contract, he noted the identity of the seller and the January 1976 purchase price. He knew Doerfer officed with Baker. He questioned Sindlinger about the Doerfer transaction. Sindlinger told him he didn't remember all the details but that the sale had been extensively negotiated between Zeiger and Doerfer. Redfern told Sindlinger part of his concern was the fact there had been no appraisal and the price Doerfer paid was substantially below market price at the time of sale. Sindlinger promised to look into the matter and get in touch with Redfern.

The sale to Luhring was closed on April 11, 1977. At Baker's request the draft for the net proceeds of $697,075.04 was made payable to "Leo M. Baker, Agent for R. E. Doerfer." After the closing, Redfern asked to meet with Sindlinger and Baker in Baker's office. At that meeting Redfern told them he felt compelled to make a report to the county bar ethics committee. Sindlinger and Baker requested a chance to discuss the problem more fully after Redfern's return from a trip. Redfern agreed. Approximately ten days later, on a Friday, the three men met in Redfern's office. The consequences of Redfern's filing of a report were discussed. On the following Monday Redfern visited Sindlinger and Baker, told

them he was going to file such a report, furnished them a copy which each acknowledged was accurate, and delivered the report to the local bar committee.

After retaining and consulting counsel, Sindlinger and Baker disclosed the situation for the first time to Audrey Zeiger. Subsequently they paid an amount equal to the profit from the Luhring sale to the Nettie Miller Estate.

Proceedings following Redfern's complaint culminated in the report recommending disbarment which is under review here. Sindlinger was disbarred on consent pursuant to Court Rule 118.5.

Baker acknowledges he knew on December 17, 1975, that he was participating in the purchase of a farm from a client of his law firm without the client's knowledge. He also acknowledges he knew at that time farm values had appreciated since July 1975. He knew the sale was voidable. Despite this knowledge he said and did nothing to disclose the facts to Zeiger or to stop the sale. Instead, he participated in the purchase of the farm through continued subterfuge with an admitted intent to realize maximum personal profit from the transaction. In fact he became more active after the purchase, and he took the initiative in negotiating the sale to Luhring. He changed his mind about keeping his share of the profit only when Redfern informed him after the closing that he felt compelled to report the situation to the county bar ethics committee.

General principles governing disciplinary proceedings are explained in other cases and will not be repeated here. See, e. g., *Committee on Professional Ethics v. Bromwell*, 221 N.W.2d 777 (Iowa 1974); *Iowa State Bar Ass'n. v. Kraschel*, 260 Iowa 187, 148 N.W.2d 621 (1967).

■ Specific violations of ethical considerations and canons are established by Baker's admitted conduct.

The most fundamental violation was of DR 5–104(A) which provides:

A lawyer shall not enter a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented [thereto] after full disclosure.

Baker's conduct also violated DR 1–102(A)(1)–(6), and EC 1–5 and 5–3, Iowa Code of Professional Responsibility for Lawyers.

■ A violation of these strictures is established without showing the client suffered economic disadvantage from the misconduct. See *In re Sandblast*, 210 Or. 65, 307 P.2d 532 (1957). However, the violation is aggravated when economic disadvantage is shown. See *Healy v. Gray*, 184 Iowa 111, 168 N.W. 222 (1918). Here the credible evidence proved that the sale by the estate in January 1976 was for a price which was substantially below fair market value and that Baker knew it. His continued participation in the transaction was motivated in part by a desire for personal profit. This goal was realized when he sold the farm later in the year for almost one-half million dollars more than he and the others had paid for it. The plan was frustrated only because the January transaction was discovered by an attorney who recognized and performed his duty to report conduct which violates the Iowa Code of Professional Responsibility for Lawyers. See DR 1–103.

Baker's misconduct justifies disbarment. This action is necessary as a penalty, as a deterrent to others, and as an indication to the public that the courts will maintain the ethics of the profession. See *State v. Johnson*, 149 Iowa 462, 468, 128 N.W. 837, 839 (1910) ("The relation between an attorney and his client must necessarily be one of great confidence, and an attorney who knowingly abuses the trust and confidence placed in him by his client is unfit for the profession and unworthy of a place therein."); *Eschwig v. State Bar of California*, 1 Cal.3d 8, 15, 81 Cal.Rptr. 352, 357, 459 P.2d 904, 909 (1969) ("A conflict of interest exists, and is inherently more dangerous, in a sale during probate such as occurred here, because it was not public, was unknown to the court, did not involve competitive bidding, and allowed petitioner to overreach or exercise undue influence upon his client."); *Ex parte McDonald*, 112 Mont. 129, 113 P.2d 790 (1941); *In re Egan*, 37 S.D. 159, 157 N.W. 310 (1916); *In re Clark*, 61 Wash.2d 547, 379 P.2d 354, cert. den. 375 U.S. 986, 84 S.Ct. 519, 11 L.Ed.2d 473 (1964); Annot., 35 A.L.R.3d 674.

Baker has now offered his license; we accept and revoke it.

LICENSE REVOKED.

All Justices concur except McGIVERIN, J., who takes no part.