### IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,

v.

### Erwin E. STAMP, Respondent.

### No. 98–2016.

Supreme Court of Iowa.

March 24, 1999.

---

Norman G. Bastemeyer and David J. Grace, Des Moines, for complainant.

Erwin E. Stamp, pro se, for respondent.

Considered by LARSON, P.J., and LAVORATO, SNELL, TERNUS, and CADY, JJ.

LAVORATO, Justice.

This lawyer disciplinary proceeding arises out of Erwin E. Stamp's representation of the Viola Putman Estate. The Iowa Supreme Court Board of Professional Ethics and Conduct alleged Stamp committed ethical violations when he purchased stock from the estate. Our Grievance Commission concluded that Stamp committed the alleged violations and recommended that he be suspended for ninety days. We find serious breaches of professional ethics that demand a longer suspension. We therefore suspend Stamp's license to practice law for one year from the filing date of this opinion.

■ Stamp has not appealed from the commission's recommendation. Nevertheless, we review the record de novo. Ct. R. 118.10. We give respectful consideration to the commission's recommendation; however, we ultimately determine what discipline is appropriate under the unique facts of each case. *Id.; Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland*, 577 N.W.2d 50, 52 (Iowa 1998). The board must prove the alleged ethical violations by a convincing preponderance of the evidence, a burden of proof that is greater than in a civil case but less than in a criminal case. *Apland*, 577 N.W.2d at 52.

## I. Facts.

Most of the facts justifying disciplinary action are undisputed. Stamp practices law in Bellevue, Iowa. He has been in practice there since 1952.

Viola Putman died on December 19, 1995. Stamp opened the estate on December 22, 1995, at the request of Nancy Binko, the deceased's stepdaughter. The court appointed Binko as executor. Binko designated Stamp as the attorney for the estate.

Putman had a safety deposit box at the Bellevue State Bank (bank). Binko and an officer of the bank inventoried the box and listed jewelry and a number of certificates of

deposit. Stamp prepared and filed the inventory and paid the inheritance tax.

In September 1996, while preparing to close the estate, Stamp contacted Binko for the safety deposit key so he could secure the certificates of deposit and liquidate them. When he opened the box, Stamp discovered an envelope containing a certificate for eighteen shares of the bank's stock. Apparently, the certificate had been overlooked at the time the safety deposit box was inventoried. The certificate was registered in the name of the decedent.

Stamp immediately contacted Binko, and they discussed the value of the stock. When questioned about this conversation at the disciplinary hearing, Stamp responded: "I told her, as far as I was concerned, the value was about what we had for the value of the stock at her dad's estate, which was $300 [per share]." Stamp had probated that estate in 1994.

Since 1994, several significant transactions surrounding the bank's stock took place. On February 27, 1995, the bank's shareholders approved the Bellevue State Bank Employee Stock Ownership Plan (ESOP). The ESOP purchased 52.5 percent (1575 shares) of the bank's stock at an appraised December 31, 1994 value of $1187.94 per share. Stamp was part of an investor group that purchased 362 shares of the bank's stock at the same price. He was also a director of the bank and continued in that status throughout the time material to these proceedings.

On May 8, 1995, the bank's shareholders—including Stamp—received a letter from the bank indicating the ESOP wanted to buy additional shares and would pay $869 per share. An appraisal of the fair market value of the stock as of December 31, 1995, valued the minority shares at $1029 per share.

Notwithstanding this history, Stamp purchased the eighteen shares of stock from the estate for $300 per share, for a total of $5400. He did this without (1) prior court approval, (2) notice to the distributees under the will, and (3) report for approval. (The will did not give the executor power to sell assets of the estate. Thus, any such sale required prior court approval, notice to the distributees un-

der the will, and report for approval once an agreement to sell had been reached. *See* Iowa Code §§ 633.383, 633.389, 633.396, 633.399 (1995)). Stamp paid no cash for the stock, but he claimed at the disciplinary hearing that he intended to offset against the purchase price his fees from the estate.

Stamp sent the distributees a copy of an unfiled final report. In that report, Stamp did not show the sale of the stock to himself. Rather, in the income portion of the report, he indicated that the bank had purchased the stock on September 27, 1996, for $5400. In the report, Stamp requested fees of $5466.90, which the court approved on the same date as the report. The report did not reflect any offset of attorney fees against the purchase price of the stock. Stamp received his fees on October 15, 1996, and Binko signed over the stock to him about one week later.

One of the distributees, a church, brought its copy of the final report to its attorney, Ronald J. Besch, raising several questions about the report. Besch noticed the final report indicated a sale of "Bank Stock" to the "Bellevue State Bank," but, in looking at the inventory, the attorney noticed the stock had not been listed. Because the final report did not reflect the number of shares sold, Besch had no way of knowing whether a fair price had been received for the stock. Besch confronted Stamp and learned the estate had sold eighteen shares of the bank's stock at $300 per share. Besch became concerned because through other sources he had learned the stock had a higher value.

Besch later learned from the bank that it had not purchased the stock from the estate but would have liked to have had the opportunity to do so. In a later conversation with the bank, Besch learned the ESOP had purchased some shares from other shareholders at a price of $869 per share. Besch again confronted Stamp, who admitted it was he who had purchased the eighteen shares of stock from the estate.

Not surprisingly, Besch's immediate reaction was that Stamp was in big trouble because (1) the stock had not been listed in the probate inventory; (2) the final report indicated the bank, rather than Stamp, had purchased the stock; (3) the shares were worth

considerably more than $300 per share; (4) Stamp had not received prior court approval for the sale to himself; and (5) Stamp was a director of the bank.

Armed with this information, Besch filed, on behalf of the church, objections to the final report, raising these matters and requesting, among other things, that the court void the sale to Stamp. In the meantime, Stamp transferred the eighteen shares of stock back to the estate. Thereafter, on December 11, 1996, the executor sold the eighteen shares of stock to the bank for $869 per share, for a total of $15,642. The sale was reflected on the final report filed on January 10, 1997.

On December 17, 1996, the district court held a hearing on the church's objections to the final report. Thereafter, the district court forwarded a copy of the church's objections to the ethics board. In its letter to the board, the court indicated that Stamp had "virtually acknowledged the allegations" of wrongdoing in the church's objections.

## II. Proceedings.

The board thereafter filed a complaint against Stamp. The complaint alleged that (1) Stamp acted as attorney for the Putman estate; (2) one of the assets of the estate was the eighteen shares of stock in the bank; (3) Stamp was a director of the bank; (4) Stamp purchased the stock from the estate for $300 per share, which was substantially below the market value; (5) Stamp had not listed the stock in the probate inventory as originally filed; (6) Stamp had concealed the nature of the stock sale in the final report mailed to the distributees; and (7) Stamp had not obtained court approval to sell the stock.

In his amended and substituted answer, Stamp admitted all of these allegations with two exceptions. He denied the price of $300 per share was substantially below the market value. He also alleged, as an affirmative defense, that the stock was not reported in the probate inventory because the certificate had been overlooked at the time the safety deposit box was inventoried.

The complaint further alleged that Stamp's actions were in violation of the following statutory provisions: Iowa Code sections 633.389 (requiring notice to distributees under will regarding sale of personal property in an estate); 633.477(9) (requiring final report to set forth an accounting of all property coming into the hands of the personal representative and a detailed accounting of all cash receipts and disbursements); and 602.10113 (providing that attorney who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge or a party is liable to be disbarred).

In addition, the complaint alleged that these actions were in violation of the following disciplinary rules of the Iowa Code of Professional Responsibility for Lawyers: DR 5–104(A) (lawyer shall not enter into business transaction with a client if they have differing interests and if the client expects the lawyer to exercise professional judgment for the protection of the client, unless the client has consented after full disclosure); DR 7–102(A)(3) (in representing a client, lawyer shall not conceal or knowingly fail to disclose that which the lawyer is required by law to reveal); and DR 1–102(A)(1) (lawyer shall not violate a disciplinary rule), (4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), (5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice), and (6) (lawyer shall not engage in any other conduct that adversely reflects on the fitness to practice law).

In his amended and substituted answer to the complaint, Stamp admitted he violated the statutory provisions and the disciplinary rules as the complaint had alleged. He made the same admissions in response to the board's requests for admissions. However, in responding to the requests for admissions, Stamp claimed he had no knowledge before he purchased the stock that the ESOP had in the past purchased shares for $869 per share. He also denied any knowledge that an appraisal firm had valued the minority shares at $1029 per share as of December 31, 1995.

At the disciplinary hearing, Stamp continued to claim he did not know the value of the stock when he bought it from the estate. In addition, Stamp tried to excuse his conduct by blaming the distributees who, he claimed,

were hounding him for their money. He thought he could expedite closing the estate and thereby satisfy the distributees by buying the stock himself.

In rejecting this defense, the commission made the following findings, which we adopt as our own:

[Stamp] urges as an affirmative defense that he did not know that the value of the bank stock was greater than $300 per share and that he bought the stock merely for purposes of expediting the closing of the estate. We believe [Stamp] is being less than candid with the [commission] in this argument. As a director of the Bellevue State Bank, he had access to voluminous information concerning the bank's assets, liabilities and income. He also knew that the ESOP had been established and was in the market for purchasing more stock by virtue of the May 1995 letter sent to all stockholders. A quick telephone call to the bank president would undoubtedly have revealed the willingness of the ESOP to buy the stock at the price of $869.

Failing to seek the court's approval of the sale, purchasing the stock from the estate at a price below its current fair market value and failing to list himself as the purchaser of the stock in the final report, show a pattern of disregard for statutory and ethical requirements. We conclude that [Stamp's] conduct constituted a violation of Iowa Code sections 633.389; 633.477(9); 602.10113; and DR 5–104(A); DR 7–102(A)(3); and DR 1–102(A)(1), (4), (5), and (6).

### III. Discipline.

■ Having determined that Stamp has violated statutory and ethical violations, our task now is to decide what sanction is appropriate under the circumstances. As we have recognized in the past,

[a] conflict of interest exists, and is inherently more dangerous, in a sale during probate such as occurred here, because it was not public, was unknown to the court, did not involve competitive bidding, and allowed petitioner to overreach or exercise undue influence upon his client.

*Committee on Prof'l Ethics & Conduct v. Baker,* 269 N.W.2d 463, 466 (Iowa 1978) (quoting *Eschwig v. State Bar of California,* 1 Cal.3d 8, 15, 81 Cal.Rptr. 352, 357, 459 P.2d 904, 909 (1969)).

In *Baker,* this court disbarred a lawyer for violating DR 5–104(A)—the prohibition against a lawyer entering into a business transaction with a client when they have differing interests. *Id.* The facts in *Baker* were similar to the facts here. The only significant difference was that Baker stood to gain one-half million dollars more than he had paid the estate. Here, Stamp stood to gain a little more than $10,000. We found that Baker was motivated by a desire for personal profit. We likewise find that Stamp was motivated by the same greed.

We decided in *Baker* on the ultimate sanction because we thought it was necessary "as a deterrent to others, and as an indication to the public that the courts will maintain the ethics of the profession." *Baker,* 269 N.W.2d at 466. Here, for the same reason, we feel Stamp should receive a more severe sanction than a ninety-day suspension, the sanction the commission recommended. The question is how much more severe the sanction should be.

Besides *Baker* there are other cases that throw light on the question. *See, e.g., Committee on Prof'l Ethics and Conduct v. Postma,* 430 N.W.2d 387, 391 (Iowa 1988) (holding a six-month suspension warranted when attorney created conflicts in interest by entering business transaction with the client; attorney also presented an ex parte order to a judge and failed to file an order with the clerk); *Committee on Prof'l Ethics & Conduct v. Mershon,* 316 N.W.2d 895, 899–900 (Iowa 1982) (holding public reprimand warranted when attorney entered business transaction without recommending client receive independent advice and did not make full disclosure to client; attorney was forthright and honest and gained no profit from the transaction).

Although we believe Stamp's actions do not rise to the level of seriousness justifying disbarment, we think his unethical actions were serious enough to warrant a one-year suspension. We therefore suspend Stamp's

license to practice law in this state indefinitely, with no possibility of reinstatement for one year from the filing date of this opinion. Upon application for reinstatement, Stamp shall have the burden to prove that he has not practiced law during the period of his suspension and that he has met the requirements for client notification set forth in Court Rule 118.18. Court Rule 118.13 shall govern any application for reinstatement. Costs are assessed against Stamp. *See* Ct. R. 118.22.

**LICENSED SUSPENDED.**