## STATE v. YENZER, et al.

No. 18138.

Circuit Court, Leon County.

September 17, 1964.

Reeves Bowen, Assistant Attorney General, for plaintiffs.

Thomas A. Testa, Miami, for defendant James W. Yenzer.

Ives & Davis, West Palm Beach, for defendant P. O. Wilber.

Edward H. Hurt, Orlando, for defendant Donald Miles.

Paul A. Louis, Miami, for defendant William K. Chester.

Holland & Smith, West Palm Beach, for defendant William A. Neely.

Harvey Ford, West Hollywood, for defendant Ewart G. Brown.

W. MAY WALKER, Circuit Judge.

This is an interpleader proceeding instituted by the state of Florida and Farris Bryant, Ray E. Green, and J. Edwin Larson, in their representative capacities as governor, comptroller, and treasurer, respectively, of the state of Florida, wherein the court has previously granted the plaintiffs' motion for a decree in their favor on the pleadings and directed them to pay to the clerk of this court the sum of $100,000, the amount of the reward es-

tablished by chapter 57-620, Laws of Florida, Acts of 1957, for information leading to the arrest and conviction of the party or parties, or any of them, responsible for the disappearance of Judge C. E. Chillingworth.

The court has also previously decreed that the plaintiffs be discharged from the cause with their costs, and acquitted and exonerated from all claim of or liability to the defendants, with the further requirement that the non-disclaiming defendants James W. Yenzer, P. O. Wilber, Donald Miles, William K. Chester and William A. Neely, and Harvey Ford, as guardian ad litem for the non-disclaiming incompetent defendant Ewart G. Brown, interplead and litigate among themselves so that the court could determine which one or ones of them are entitled to receive the balance of said $100,000 after the payment of appropriate costs therefrom.

All of such non-disclaiming defendants have filed pleadings in the nature of cross-claims in which they assert their respective claims to said reward money.

The defendants Edna V. Trepp and her husband, Joseph Trepp, and Ellen Linnea Jensen, and each of them, have filed an appropriate disclaimer and waiver forever disclaiming and renouncing all right and interest in and to the reward money, and, therefore, have no claim or interest in the result of this proceeding.

The defendant Ewart G. Brown has been duly adjudged incompetent by order entered by the county judge of Palm Beach County on June 19, 1958, and by appropriate committment, issued on the same day, has been committed to the South Florida State Hospital at West Hollywood. The committment is still in full force and effect, and the said Ewart G. Brown is still confined at the said mental institution. Harvey Ford, a practicing attorney residing at Hollywood, Florida, has been duly appointed guardian ad litem for said incompetent, and has seasonably qualified, answered, and represented him in this proceeding.

The six non-disclaiming defendants are the sole and only claimants to the reward money. So the question to be resolved is which claimant or claimants of these six are entitled to the reward.

The case has been finally heard, the evidence taken, and counsel for the respective parties have presented their final arguments and submitted the case to the court for consideration and the entry of a final decree.

The evidence discloses, among other things, that on June 15, 1955, the Honorable C. E. Chillingworth, a distinguished circuit judge of the 15th judicial circuit of Florida, and his wife Marjorie Chillingworth, while at their beach home in Palm Beach

County, disappeared; that the law enforcement officers of the state for a long time thereafter faithfully and diligently, but vainly, sought clues to the fate of Judge and Mrs. Chillingworth; that upon request of Sheriff John Kirk of Palm Beach County the Florida sheriffs' bureau entered into the investigation of the case about November 17, 1958. Thereafter, following considerable investigation by the sheriffs' bureau, together with the sheriff's office of Palm Beach County and together with certain claimants hereinafter specifically mentioned, the case was solved and Floyd A. Holzapfel and Joseph A. Peel, Jr., were arrested for the murder of Judge and Mrs. Chillingworth.

On November 23, 1960, a grand jury impaneled by the circuit court of Palm Beach County returned an indictment charging the said Floyd A. Holzapfel with the first degree murder of Judge Chillingworth and charging the said Joseph A. Peel, Jr. with being an accessory before the fact to said murder. On December 12, 1960, Holzapfel pleaded guilty to said indictment in the circuit court of Palm Beach County, and on the same day was duly adjudged guilty of first degree murder as charged in the indictment. On May 3, 1961, the circuit court of Palm Beach County sentenced Holzapfel to death by electrocution for the murder of Judge Chillingworth, the said murder for which he had been convicted. Holzapfel took no appeal from the sentence pronounced against him. Joseph A. Peel, Jr., after a change of venue in his case from the Palm Beach County circuit court to the St. Lucie County circuit court was thereafter duly tried and convicted by a jury of the crime of accessory before the fact to murder in the first degree, with a recommendation to mercy. On April 26, 1961, he was adjudged guilty by the court of such crime and sentenced to the state prison for the remainder of his natural life. He took a timely appeal to the District Court of Appeal, Second District, from the judgment and sentence so pronounced against him and later appealed to the Supreme Court of Florida with the result that the judgment and sentence was affirmed by both appellate courts. (Peel v. State, 154 So.2d 910, and Peel v. State, __ So.2d __.)

It is also noted that the said Floyd A. Holzapfel and Joseph A. Peel, Jr., were duly indicted, tried and convicted, respectively, for the murder and for being an accessory before the fact to the murder of Mrs. Chillingworth. Holzapfel's conviction in this case, as in the other, was predicated upon a plea of guilty and he did not appeal therefrom. Joseph A. Peel, Jr. also prosecuted an appeal from his conviction in this case to the District Court of Appeal, Second District, and to the Supreme Court, where his conviction for his crime in this case was also affirmed by both appellate courts. (Peel v. State, 150 So.2d 281, and Peel v. State, __ So.2d __.)

The evidence further discloses, among other things, that James W. Yenzer, one of the claimants, was born at West Palm Beach on January 11, 1930, and has resided ever since in the state of Florida; that immediately after the enactment of the Act establishing the reward, he became aware of the enactment and the provisions thereof; that thereafter, with full intention and purpose to claim the reward, he conducted on his own behalf, and together with agents of the Florida sheriffs' bureau, an investigation to obtain information and evidence identifying the party or parties responsible for the disappearance or murder of Judge C. E. Chillingworth; that he met Floyd A. Holzapfel either in March or April of 1956, in Miami; that he was introduced to Holzapfel by Joseph A. Peel, Jr., with whom he had been acquainted a substantial length of time; that during March or April, 1959, he informed Henry J. Lovern, a special agent of the Florida sheriffs' bureau, that Holzapfel was one of the parties responsible for the disappearance and murder of Judge C. E. Chillingworth, and how the crime had been committed, step by step as related to him by Holzapfel.

Thereafter, on November 13, 1959, the claimant James W. Yenzer made a sworn statement to Henry J. Lovern, special agent of the Florida sheriffs' bureau, at Tallahassee, in which he related very important information regarding the disappearance of Judge and Mrs. Chillingworth. In addition to other valuable information, the statement includes the following (questions by Mr. Lovern and answers by Mr. Yenzer) —

> I have here a photograph, dated January 5, 1959, which carries the number 13603 of the sheriff's office, Palm Beach County. I now show you this photograph and ask you if you know this person.—Yes, that's Floyd Holzapfel.
>
> Do you know this person under any other name?—Yeah, they call him "Lucky" and he uses the name "John Lynch".
>
> \* \* \*
>
> I now show you a photograph of a person and ask you if you can identify it.—Yes, that's Joe Peel.
>
> Do you know Peel under any other name?—No, his full name by birth is Joseph Alexander Peel, Jr.
>
> \* \* \*
>
> Mr. Yenzer, on June 15, 1955, Judge and Mrs. Chillingworth were discovered to be missing from their home in Palm Beach County. Do you know anything about this matter?—I went to Miami in the latter part of December of 1958 [evidently meaning 1957] and contacted Floyd, who got me a job at the Deauville Hotel in the early part of January of 1958. We worked there as security officers. Around March or April of 1958, one evening when I was on duty and Floyd was off, he had been out drinking in several nightclubs and he stopped by the hotel to see me at 2 or 3 in the morning and we sat on the ramp of the hotel in his car. He'd called me out. Talking for a while and we got to talking about Joe Peel. He was saying all the things he had done for Joe—I guess what prompted

all this conversation was that neither one of us had any money and he was in need of money and he had asked Joe and he had never come through with the money. At that time he told me that he committed the Chillingworth murders. He said he did it for Joe and that Joe still owed him $900 expense money that he took out of his own pocket. He took me through the entire crime as it happened, going into . . . gaining access to the house . . .

It should be noted that the information embraced within the statement, as well as the information quoted therefrom, was previously given to the Florida sheriffs' bureau by Yenzer during March or April of 1959, considerably before the sworn statement on November 13, 1959.

Three additional sworn statements were given later by Yenzer to Lovern. One on November 22, 1959, one on June 9, 1960, and one on June 30, 1960. Each embraced valuable information with respect to the Chillingworth murders.

The evidence further discloses that on May 13, 1959, Holzapfel invited Yenzer to join with him in the theft of a cache of arms that was bound for a revolution in Nicaragua and by way of pretext or ruse so as to solidify himself into the confidence of Holzapfel, Yenzer pretended to accept the invitation. He persuaded Holzapfel to postpone the theft until the following night of the 14th at the request of Henry Lovern of the Florida sheriffs' bureau — who had in the meantime been advised of the proposal by Yenzer — so that Lovern and other law enforcement officers could appear at the scene at the appropriate time. Pursuant to the understanding, Yenzer joined Holzapfel on the night of the 14th and rented a Hertz truck himself with which to haul the guns away. They broke and entered a house in which the guns were located, loaded the guns on the truck but were intercepted about two blocks away where Holzapfel was arrested and Yenzer was narrowly missed by gun fire from one of the officers but permitted to escape.

On July 24, 1959, Holzapfel again admitted to Yenzer his participation in the disappearance and murder of the Chillingworths. On or about September 21, 1959, and thereafter, Joseph A. Peel, Jr. admitted to Yenzer that Holzapfel could put him in the electric chair for the Chillingworth murders. On or about February 4, 1960, Peel admitted to Yenzer that he had the Chillingworths killed because the judge knew that Peel was involved in gambling. On or about June 9, 1960, at Cocoa Beach, Florida, Peel told Yenzer where the Chillingworth bodies were. This information was repeated by Peel to Yenzer on or about June 22, 1960.

The evidence further discloses that Peel on or about October 15, 1959, and thereafter, apprehensive about Holzapfel causing him to suffer, be convicted or electrocuted for the Chillingworth

murders, proposed that Yenzer kill Holzapfel; that so as to implant himself into Peel's confidence and acquire more and further information with respect to the Chillingworth murders, Yenzer pretended to enter into such a conspiracy and to accept the assignment for a price agreed upon. They thereafter met and discussed the proposal on several occasions and the price was increased three or more times. The price at one time was $2,000, later $3,000, still later $5,300, and still more later $10,300. Peel paid Yenzer $8,300 in various installments upon the total price agreed upon between them, including an installment of $3,000 on September 30, 1960, at which time he promised to pay the balance when Yenzer performed his mission. It should be noted that the evidence is clear that Yenzer had no intention to kill Holzapfel and that he agreed ostensibly with Peel to do so only for the purpose hereinabove stated. It should also be noted that his negotiations and activities in the furtherance of the pretext were with the full knowledge and cooperation of the sheriffs' bureau.

There were numerous meetings and discussions between Yenzer and Holzapfel and between Yenzer and Peel about the murder of the Chillingworths; that at such meetings and discussions with Holzapfel, he made many statements and admissions pointing to the responsibility of himself and Peel for such crime; that at such meetings and discussions with Peel he also made many statements and admissions pointing to the responsibility of himself and Holzapfel for such crime; that many of the statements and admissions were tape recorded by and with the cooperation of the sheriffs' bureau; that after the first contact of Yenzer by Lovern, special agent of the sheriffs' bureau, all of such statements and admissions were promptly communicated to Lovern upon receipt thereof by Yenzer; that from Yenzer's first contact in February of 1959 until the trial in Fort Pierce, Florida, which commenced in March, 1961, he worked with Lovern on the case cooperatively and productively; that Lovern was almost in daily contact with him; that they had many conferences, arranged and attended many meetings, and travelled together considerably.

It is argued among other contentions that Yenzer should not receive the reward because he was a paid agent, officer, or employee of the sheriffs' bureau. In many jurisdictions, the "principle is settled, on considerations of public policy, that an officer cannot lawfully claim a reward for the performance of a service which it was his duty to discharge."

However, Yenzer was not an officer of the sheriffs' bureau. He was not deputized or authorized to make an arrest. He was not on the regular payroll. He was not a regular employee of the bureau in any sense of the word. He was simply "an undercover

man" or a confidential informer for the purpose of discovering more evidence, in addition to that already discovered by him, in the case. From the modest compensation paid him, the sheriffs' bureau did not deduct withholding taxes, social security or retirement contributions. Actually, he commenced the flow of important information to the sheriffs' bureau about March of 1959, and steadily continued the flow until the trial of the Chillingworth cases in 1961.

It was not until the latter part of 1959 when the sheriffs' bureau commenced to compensate him. The compensation included $100 or $125 each for five or six recordings about the case taped from Peel, and then a weekly compensation of $125. The compensation was provided only after Yenzer's services had been used to such an extent by the sheriffs' bureau in the investigation of the case that he had necessarily neglected and lost his job with the Globe Ticket Company. Some pay was necessary at this point in his long span of contribution to provide living expenses for himself and family and so that he could continue his effective work and assistance. However, it should be understood that long before Yenzer was paid any compensation he had already furnished to the sheriffs' bureau and other law enforcement agencies very valuable information regarding the Chillingworth case. He had already related to Henry Lovern the admissions and valuable information given him by Floyd Holzapfel at or near the Deauville Hotel in Miami. He had already on May 14, 1959, ostensibly engaged in the cache of arms theft with Holzapfel for the purposes already related and where he was narrowly missed by gun fire. In addition, he had already obtained several admissions, tape recorded and otherwise, from Holzapfel and Peel, besides other information.

So in view of the facts and circumstances upon which Yenzer's claim is predicated, the rule against a public officer claiming a reward for the performance of a service for which he has a duty to discharge is not applicable. (46 Am.Jur., Rewards, § 17; 21 F. L. P., Rewards, § 10) Certainly, he should be permitted to participate on a just and equitable basis.

The principle of apportionment and payment is stated in 46 Am.Jur., Rewards, § 26, as follows —

"It is well settled that several persons who by concerted action join in performing the specified services thereby become entitled to participate in a reward. The view has been expressed that the apportionment of a reward should be limited to such cases. *But the weight of authority* is to the effect that a reward may be apportioned equitably among several claimants whose efforts contributed to produce the result for the accomplishment of which the reward was offered, even where they acted independently." (Italics added.)

Directing attention to P. O. Wilber, another claimant, the evidence discloses that he has for a long time prior to and at all times since the disappearance of Judge and Mrs. Chillingworth been a resident of Palm Beach County, and engaged in the bail bond business at West Palm Beach; that at the time of such disappearance, Wilber was and had been for a long time familiar with Holzapfel and on friendly terms with him; that knowing about the enactment of the reward and shortly thereafter for the purpose of securing the same, he began a systematic investigation in order to locate and secure evidence leading to the arrest and conviction of the party or parties responsible for the disappearance of Judge Chillingworth; that he, in the furtherance of such plan, determined that Holzapfel was one of the parties involved in the disappearance of Judge Chillingworth and through investigation determined that Holzapfel, during August, 1960, and for several months previous thereto, was residing or hiding in South America and, after considerable effort, induced Holzapfel to leave South America and return to the state of Florida; that in furtherance of his plan he met Holzapfel in the city of Melbourne, Florida, where he, with the cooperation and assistance of the Florida sheriffs' bureau, set up hidden microphones and tape recorders and on or about October 2, 1960, procured a full and complete, tape recorded, confession from Holzapfel as to his participation in the kidnapping and murder of Judge Chillingworth and his wife on June 15, 1955.

Holzapfel, in his confession, named Bobby Lincoln and himself as the actual murderers and related the guilt of Joseph A. Peel, Jr., and named him the so-called "master-mind" of the crime. The recitation of the gruesome details of the confession and inhuman crime would serve no useful purpose.

Subsequent to the conviction of Holzapfel for the theft of the cache of arms and his entry of an appeal therefrom, he was released upon a supersedeas bond, one-half of which was provided by Wilber or the company represented by him; that thereafter, Holzapfel ventured into a mortgage business with Peel and others at Orlando and later apprehending that he would be arrested for another alleged murder, proceeded to South America and took refuge in Brazil, a country with which the United States had no extradition treaty; that Wilber in his effort to have Holzapfel return to this country, did, among other things, make eight or ten telephone calls to him; that the first call was tape recorded at Wilber's own expense; that many of the other calls were tape recorded by and with the cooperation of Henry Lovern, agent of the sheriffs' bureau; that two or three calls were made under circumstances where they could not be recorded; that in furtherance of his plan to have Holzapfel return, Wilber agreed to send him appropriate transportation, or a ticket, with which to re-

turn; that the transportation was provided through the sheriffs' bureau; that Wilber in the furtherance and execution of his plan to lure Holzapfel back into this country and to obtain a full confession from him, suffered considerable strain; that the confession was obtained in a room in a motel at Melbourne, Florida, where Wilber and Holzapfel stayed from September 30 through October 3, 1960, and where long discussions were held between them regarding the Chillingworth disappearance and murder; that during the discussions and utterance of the confession Wilber and Holzapfel were alone in said room with no one else present — although there were present in the adjoining room Mr. Ross Anderson, assistant director of the sheriffs' bureau, and Mr. Lovern. Also present in such adjoining room were the Honorable Phil O'Connell, state attorney of the 15th judicial circuit, and the Honorable John Kirk, then sheriff of Palm Beach County, at various intervals of time during the period from September 30 through October 3, 1960.

The tape recording equipment was set up so that the officers in the adjoining room could hear the conversation between Wilber and Holzapfel. Of course, Holzapfel was neither aware of the tape recording equipment nor the presence of the officers in the adjoining room.

Parenthetically, it should be noted that claimant Yenzer had learned about Holzapfel's return from Brazil and rendered material assistance in arranging for the meeting between Holzapfel and Wilber in the motel room.

During this particular meeting with Holzapfel, Wilber lost eleven pounds in weight and at the conclusion of his mission on October 3, 1960, was tired and sick. Aside from other evidence, his effectiveness is indicated, somewhat, in the following excerpt from the evidence of Mr. O'Connell, the very able state attorney and a witness in this proceeding, to-wit —

> Think real hard, now, and do you recall a statement made in those tapes by Mr. Holzapfel while Mr. Wilber was in the room to this effect, "I wouldn't give Jim Yenzer the time of day.?"—I do not recall that. I won't say it didn't happen, but I don't recall it. I don't recall it. There's one part of that tape I will remember the rest of my life where Mr. Wilber kept saying, "Don't tell me any more, don't tell me any more. I've heard enough. You are scaring me to death." And every time he said that Holzapfel would talk more. We were scared to death that that sort of thing would stop him from talking but it had the reverse effect.
>
> It had the reverse effect?—Yes.
>
> And then at that time isn't it a fact that nobody was in that room but Mr. Wilber and Holzapfel?—That's my understanding, yes.

There were many other meetings and discussions between Wilber and Holzapfel and between Wilber and Peel about the murder of the Chillingworths; that at such other meetings and discus-

sions with Holzapfel, he made many statements and admissions pointing to the responsibility of himself and Peel for such crime; that at such meetings and discussions with Peel he also made many statements and admissions pointing to the responsibility of himself and Holzapfel for such crime.

The contribution of Wilber was important and vital and except for the lack of proof of the corpus delicti, Holzapfel's confession made the case complete and ready for trial. It should also be noted that Wilber received no compensation and no expense money incident to his valuable contribution except for the payment in his behalf of one or two telephone calls and one or two nights' room rent. Moreover, because of the intensity of his investigation and his constant preoccupation therewith, he suffered considerable losses in his business and personal affairs.

Directing attention to the claim of Donald Miles, the evidence discloses that Miles, being aware of the reward enactment and intending to earn the reward, concluded upon a plan to furnish the assistance and information specified in the enactment; that between the 22nd and 25th of October, 1960, he contacted the sheriffs' bureau and on the latter date made a full and complete disclosure as to his knowledge and information of Peel's whereabouts at that time; that on October 27, 1960, he made a sworn and complete statement to Mr. O'Connell, the state attorney, with reference to his knowledge and information of Peel's activity and responsibility pertaining to the disappearance and murder of Judge and Mrs. Chillingworth; that the law enforcement officers investigating the case having concluded that they had sufficient evidence for the arrest, trial and conviction of Peel, and not knowing his whereabouts were anxious for him to be found, arrested, and returned to Florida; that during the month of October, 1960, Peel, although not in custody, had fled from the state of Florida into the states of Georgia, Virginia, Ohio, and Pennsylvania, and had moved himself considerably in the New England area and was about to abscond from the United States and go into a foreign country; that during the time Donald Miles made several contacts with Peel, personally, by telephone, and otherwise, and decided upon a pretext for arranging a meeting with him so as to effect his capture; that he pretended to Peel that he too wanted to depart the United States and enter a foreign country; that he went to the state of Ohio for the purpose of awaiting word from Peel, and cooperated with the sheriffs' bureau during the early part of November, 1960, in arranging a meeting with Peel designed to elicit more information and to effectuate his capture; that pursuant to claimant's plan and contacts with Peel, a meeting was first scheduled with him at a hotel in Virginia where Peel was

registered under the name of "Joseph Phillips", but claimant could not make this meeting and they agreed to meet instead at Cincinnati, Ohio; that pursuant to understanding, claimant went to the home of his brother in Cincinnati and awaited the arrival of Peel who did not appear but cancelled this meeting because of bad weather and the unavailability of an airplane flight into Cincinnati; that they then agreed upon a meeting in a room at the Patton Hotel in Chattanooga, Tennessee, for November 4, 1960; that claimant phoned Henry Lovern from Ohio and advised him of the change in date and place for the meeting; that Lovern arranged for claimant to occupy a room in the hotel under the assumed name of "Donald Miller" and arranged for tape recording equipment and the presence of officers in the adjoining room; that Peel, upon arrival at the Chattanooga airport on the meeting date, phoned claimant and inquired if it were safe for him to come to the hotel; that claimant assured him that it was safe and Peel proceeded to the said hotel, and upon arrival thereat again phoned claimant and inquired if it were safe for him to proceed to claimant's room; that claimant assured him that it was safe and Peel thereupon proceeded to the room and the meeting proceeded pursuant to schedule; that after a taped conversation between claimant and Peel and at a time when Peel was departing from the room of claimant, he was then and there arrested at the scene to which he had been lured for such purpose; that present in the adjoining room during the conversation were James Bookie Turner, sheriff of Hamilton County, Tennessee, John F. Kirk, then sheriff of Palm Beach County, Don McLeod, director of the Florida sheriffs' bureau, and Henry Lovern, special agent of the sheriffs' bureau; that tape recording equipment connected the two rooms and was so set up that the law enforcement officers in their room could hear the conversation between claimant and Peel, although Peel was unaware of the recording equipment and the presence of the officers in the adjoining room; that pursuant to plan, pretext and prearrangement, as aforesaid, the officers arrested Peel for the Chillingworth murder and returned him to the state of Florida where he was indicted, tried and convicted as hereinbefore stated; that such capture was brought about through Miles' own efforts by and with the cooperation and direction of the sheriffs' bureau without assistance from any of the other claimants, and under circumstances that exposed him to grave danger; that in addition thereto, Donald Miles, gave O'Connell and Lovern very important information with respect to the responsibility of Peel and Holzapfel for such crime. However, the tape recorded conversation at the Patton Hotel in Chattanooga was not one of special significance or consequence except for the part it played in the important and vital mission of tracking down and capturing Peel.

Directing attention to the claim of William K. Chester, the evidence discloses, among other things, that during the month of October, 1960, and prior and subsequent thereto, Mr. Chester was a duly qualified member of the Bar of Florida and actively engaged in the practice of law with offices at Palm Beach; that George David Lincoln, otherwise known as Bobby Lincoln, during said month, and prior and subsequent thereto, was an inmate of the Federal Correctional Institution at Tallahassee, Florida; that on the 27th of said month claimant saw Lincoln at his request at said institution at which time Lincoln conferred with claimant with reference to the Chillingworth disappearance and murder; that on this occasion Lincoln made to claimant a full and complete disclosure of the murder of Judge and Mrs. Chillingworth and of his responsibility and participation, as well as the responsibility and participation of Holzapfel and Peel, and requested claimant to take the information and do what he could for him; that claimant agreed to do what he could for him and advised Lincoln that he would contact Mr. Phil O'Connell, the state attorney; that Chester and Lincoln agreed that if it were not inconsistent with the duty of the former to the latter that Chester would claim the reward; that very soon thereafter claimant conferred with the said state attorney two or more times in behalf of Lincoln with the result that they reached an agreement whereby Lincoln would turn state's evidence and testify fully, fairly and truthfully in behalf of the state in the prosecution of Holzapfel and Peel, and each of them, for the murder of Judge and Mrs. Chillingworth, in exchange for immunity against his prosecution for either of said murders, and in exchange for immunity against his prosecution for the Lew Gene Harvey murder; that pursuant to such agreement, Lincoln was carried to West Palm Beach, temporarily, and on October 30, 1960, made a full and complete disclosure of the murder of Judge and Mrs. Chillingworth to the state attorney, together with a sworn statement of the true facts with respect thereto; that with the turning of the state's evidence by Lincoln, an eye witness, the essential and needed proof of the corpus delicti became available, and the proof otherwise, though already considered sufficient, became stronger; that shortly thereafter warrants were issued for the arrest of Holzapfel and Peel for such murder; that Holzapfel soon learned of Lincoln's confession to the state attorney, and very shortly, after being confronted by Lincoln, also confessed to the state attorney.

The evidence also discloses that throughout the effort, proceedings and activities upon which Chester bases his claim to the reward, the relation of attorney and client existed as between himself and Lincoln. In fact, this relationship is not disputed. But claimant contends he had a double motivation — (1) to help his client, and (2) to claim the reward.

In 3 Fla.Jur., Attorneys at law, § 32, it is appropriately said —

"The relation of attorney and client is one of the most important as well as the most sacred known to the law. This relationship is personal, confidential, fiduciary, and in the nature of a trust. In a limited and dignified sense, the relationship is one of master and servant, involving the highest personal trust and confidence.

"The attorney is bound to exercise his trust with the strictest fidelity * * * ."

It is stated, among other things, in § 33, pages 368 and 369 of said volume, as follows —

"The duty of the attorney is to advise, counsel, and fully protect and advance the interest of his client. * * * A lawyer's obligation to his client is limited only by his higher duty to his country, * * * ."

7 C. J. S., Attorney and Client, § 125; Healy vs. Gray, 168 N. W. 222, 225.

In 103 N. Y. S. 554, Nichols v. Riley, it is aptly stated —

"The fidelity which an attorney owes to his client is to use every endeavor in his power to the advantage of his client."

Moreover, the Holy Writ in verse 13 of chapter 16 of St. Luke ordains that — "No servant can serve two masters."

An attorney should not use any information garnered from his position for the benefit of himself or for the benefit of any other person save his client.

Subsection 1 of section II of rule B of the code of ethics governing the conduct of attorneys in Florida requires, among other things, that a lawyer — " * * * represent the interest of the client with undivided fidelity * * * ."

It seems clear that the information furnished by claimant Chester, as reflected in Lincoln's confession and turning of state's evidence, was not furnished in response to the reward offer but furnished in response to his sacred and solemn duty to his client, Bobby Lincoln. Irrespective of the reward, it was the duty of claimant to "use every endeavor in his power" in behalf of his client. Apparently, the information furnished by Chester was furnished in an effort to save Lincoln from evident doom. As a matter of law, the reward in nowise could have influenced, changed or altered the effort, duty or responsibility of Chester to his client and was, therefore, no inducement and no consideration for the information furnished by him. Moreover, the state

has already paid in full and to the utmost extent for such information by granting Lincoln immunity against prosecution in three separate and distinct murder cases.

It follows, therefore, that Chester did nothing beyond the scope of his legal duty in the defense of his client Lincoln and is, therefore, not entitled to participate in the reward offered by the state for which he has made claim in this proceeding.

Directing attention to the claims of William A. Neely and Ewart G. Brown, the two remaining claims, it clearly appears from the evidence that the service performed or the information furnished by each of these claimants was meager and insufficient. Neither testified at the said Peel trial. The information furnished by neither led to the arrest or conviction of any party or parties "responsible for the disappearance of Judge C. E. Chillingworth." Moreover, neither furnished any information in response to the reward offer. On the other hand, the alleged information furnished by each was furnished long before the reward was established by virtue of the enactment of chapter 57-620, supra.

The majority of the cases involving the question appear to hold that knowledge of the offer of a reward and an intention to claim it at the time of the performance of the specified service are essential to the right to recover the reward. The majority view is sound and is clearly followed in this state. Sumerel v. Pinder, 83 So.2d 692; 28 Fla. Jur., Rewards, Section 6; 21 F. L. P., Rewards, Section 8; 46 Am. Jur., Rewards, Section 18; State v. Malm, 143 Conn. 462, 123 A.2d 276; Glover v. District of Columbia, 77 A.2d 788.

Having, therefore, considered all of the evidence and reduced and adjusted the amount of the reward to be decreed claimant Yenzer in the light of the compensation paid him by the sheriffs' bureau, and being fully advised in the premises, it is accordingly ordered, adjudged and decreed by the court as follows —

(1) That the preponderance of proof and the equities of the proceeding are with the claimants Yenzer, Wilber and Miles and against the claimants Chester, Neely and Brown.

(2) That the claims of William K. Chester, William A. Neely and Ewart G. Brown, and each of them, are without merit and are hereby severally denied and dismissed.

(3) That claimants Yenzer, Wilber and Miles furnished the essential and vital information to the appropriate authorities that led to the arrest and conviction of Floyd A. Holzapfel and Joseph A. Peel, Jr., two of the parties "responsible for the disappearance of Judge C. E. Chillingworth," which said responsibility is hereby, accordingly, adjudicated.

(4) That a due regard for the proportionate value of the information furnished by such claimants and a fair and equitable distribution of the reward impels distribution in the proportions hereinafter provided.

(5) That after the payment from the reward of the compensation hereinafter fixed for Harvey Ford, as guardian ad litem for Ewart G. Brown, the incompetent defendant, and after the payment therefrom of all other court costs of this proceeding, to be taxed by the clerk according to law, the said clerk shall forthwith pay and distribute the balance of said reward money on deposit with him to the following claimants, in the following proportions, to-wit—to James W. Yenzer, 35% thereof; to P. O. Wilber, 55% thereof; and to Donald Miles, 10% thereof; and the clerk shall file his certificate herein showing such payment and distribution.

(6) That the amount of $850 is hereby fixed as a fair and reasonable compensation, including expenses, for said guardian ad litem.