**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peter John MILISCI et al., Defendants-
Appellants.**

**No. 71-2577.**

United States Court of Appeals,
Fifth Circuit.

Aug. 17, 1972.

Rehearings Denied Sept. 7, Oct. 18, 1972.

Certiorari Denied Dec. 18, 1972.
See 93 S.Ct. 684.

States in violation of 21 U.S.C.A. § 176a. Six of the original seven defendants have appealed their conviction and sentences. The remaining defendant, one Rosentrouch, originally charged as a conspirator, entered a plea of guilty to a lesser offense and his indictment was dismissed. He was one of the principal witnesses at the trial of the remaining six.

Nowhere in the briefs filed by the appellants nor in the government's briefs is there a clear statement of the facts which were brought out during the trial of the case. In view of the fact that all of the defendants contended that there was a failure of proof by the government of the facts essential to establish a conspiracy to the satisfaction of the jury beyond a reasonable doubt, the appellants' briefs were deficient in that they did not undertake to state the facts actually proved as against themselves in the light most favorable to the government. Nor, in turn, did the government, in its very abbreviated brief, undertake to list precisely, the evidence in this 600 page record which, under its theory of the case, precisely pointed to the involvement of each of the six individuals. This has made it necessary for the court to read carefully every page of the transcript of the evidence in the case.

Having carefully read the testimony of all the witnesses and having considered all of the motions for exclusion of testimony and the rulings of the trial court, we state briefly the facts with respect to each group of defendants.

On or about February 11, 1971, the alleged date of the commencement of the conspiracy, Peter John Milisci and Royce Brinson met with special agent Rogue of the United States Bureau of Narcotics, not knowing that Rogue was other than the owner of a boat which they wished to engage. At this meeting Brinson and Milisci told Rogue that they wanted to charter a boat capable of carrying approximately one and a half tons of marijuana from Jamaica to the United States. As a result of this meeting, they did, indeed, charter a motor

Arthur Massey, Miami, Fla., Albert Lehrer, Washington, D. C., for Milisci.

Joel Hirschhorn, Miami, Fla. (Court appointed), for Corbett and Brinson.

Edward C. Sawyer, Coconut Grove, Fla., for Beauchamp.

Philip J. Mandina, Miami, Fla., for Kline.

Robert W. Rust, U. S. Atty., Harold F. Keefe, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before TUTTLE, MORGAN and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

The defendants in this case were convicted of a conspiracy to import large amounts of marijuana into the United

702

vessel—the Cayman Pilot—which was berthed at Grand Cayman Island, for the purpose of transporting the drug. It would be necessary for them to fly to Grand Cayman Island in order to pick up the vessel, a fishing boat of some 52 feet in length.

On February 13, 1971, Tom Corbett, Aubrey Wayne Beauchamp and Paul Wescott Kline met with Rogue at Miami International Airport and flew to Grand Cayman Island. Brinson flew over separately. The record does not disclose that the funds for this flight were furnished from government sources. However, it is clear that Rogue had arranged for them to get in touch with a friend of his named Bethel, known as a "cooperating individual", who was not paid for his services by the government but who was furnished with the funds necessary for him to acquire the motor vessel from its owner for the proposed trip. The group stayed with Bethel during the evening and night of February 13th and on February 14th, the group, excluding Brinson, boarded the motor vessel at Grand Cayman Island and proceeded to Jamaica. They expected Brinson to be in Jamaica at their arrival.

Evidence that could be believed by the jury was to the effect that Bethel, although considered as the captain, appeared not to be familiar with the waters in the vicinity of Jamaica towards which the group was headed, but that Beauchamp produced charts covering the area of the trip and that he and Bethel poured over the charts and charted the course to the vicinity of a marked spot at Jamaica. There is ample evidence that during several conversations while aboard the vessel, Corbett, Beauchamp and Kline all discussed the objective of the trip and each of them stated some reason as to why he was involved in this kind of a scheme. Corbett was apparently sick during much of the trip and was not as much in evidence as the other members of the party. However, there was testimony that he discussed the project on several different occasions. Also, there was testimony that he

was present at an apartment the night before they flew to the Islands together with Kline and Brinson and Milisci who "were talking and giving me [Rosentrouch] the details on the boat, and they said that the boat was docked in Grand Cayman Island, and they would have to fly—that whoever was going on the boat was going to fly there and proceed from Grand Cayman Islands to Jamaica".

■ In brief, our reading of the record makes it plain that there was ample evidence from which the jury could conclude that beginning on February 11th a conspiracy existed among all of the six named appellants substantially as charged in the indictment. In order not to leave the story incomplete we add the following: The Cayman Pilot attempted to make contact at night with the ground party at Jamaica, but the crew were unable to raise any one by walkie talkie instruments. The vessel ran aground, was refloated, and limped back to Grand Cayman Island. The government, through Rogue and Bethel, paid the owner of the boat $2000 for charter hire and some $600 for repairs. The conspirators flew home without any contraband.

■ Although what we have heretofore said makes clear that we have concluded that there was sufficient evidence to establish the existence of the conspiracy, and we also state that there was ample evidence to prove several of the alleged overt acts, the appellants all complain here, as they did in the trial court, that testimony received from Rosentrouch included evidence concerning efforts made by Rosentrouch and Milisci to set up the trip to Jamaica some weeks before the alleged commencement of this conspiracy on February 11th. Although the trial court ruled out testimony by government agent Prevette, relating to a good many transactions and discussions between Rosentrouch, Rogue and Milisci that occurred in connection with an abortive effort to complete the trip earlier, the trial court, properly we think, permitted to stand substantial evidence relating to the initial effort by Rosen-

trouch to set up a plan involving the use of a boat and its essential crew necessary to carry out the illegal importation of marijuana into the United States. The record discloses that the first boat obtained as a result of the payment by Rosentrouch of the sum of $3,000 to Milisci ran into difficulties and the trip was never completed. However, Rosentrouch and Milisci pursued the matter with Rogue, the undercover agent, who then made the final arrangements to obtain the Cayman Pilot from Bethel on February 14th, the boat on which the alleged conspirators did actually embark and proceed to Jamaica.

Appellants strongly urge that the aborted effort that occurred prior to February 11th was an entirely different conspiracy, and any evidence relating to it was immaterial and irrelevant to the conspiracy charged and, of course, was highly prejudicial. Undoubtedly it was prejudicial, but also, undoubtedly, it was relevant for the government to show the efforts which Rosentrouch and Milisci, the original conspirators, where engaging in in trying to work up a final group which could effectuate their plan. The fact that the conspiracy involving all persons who were finally tried, finally brought together all of them on February 11th or 12th, does not mean that it is improper for the government to prove the steps that had to be taken by some of the conspirators in bringing the final group together to enter into the conspiracy "on or about February 11th." We find no error in the admission of evidence relating to the acts that occurred prior to that date.

We do not place this on the basis that the principle that when the terminology "on or about" is used the court may permit proof of occurrences within as much as "several weeks" of the date stated, cf. Kokotan v. United States, 10 Cir., 1969, 408 F.2d 1134, and United States v. Antonelli, 1st Cir., 1971, 439 F.2d 1068, but rather on the fact that the existence of a conspiracy on or about February 11th may be proved by showing the actions of the person who later perfected the conspiracy leading up to the date on which the conspiracy was actually formed. We think it clear that the jury could believe, under Rosentrouch's testimony, that he had involved Milisci, who had in turn involved the others in a plan to organize a group just as soon as they could be assembled to carry out the purpose of causing the importation of a large amount of marijuana from Jamaica into the United States, and that this group was finally brought together on February 11th, when the conspiracy was actually effective. In this connection see United States v. Fassler, 9 Cir., 1970, 434 F.2d 161. Of course, also, when the conduct of some of the defendants on board the Cayman Pilot might otherwise be ambiguous, if their testimony was believed, the evidence of the participation by at least one of them in the pre-February 11th efforts is relevant to dispel or explain the ambiguity by showing earlier acts clearly identified with a purpose to bring in a large quantity of marijuana to one of the lower Florida Keys.

All of the appellants, other than Beauchamp, complain of the failure of the trial court to sever their clients for separate trials, once it became apparent that Beauchamp was going to urge the defense of entrapment. However, reading the record as carefully as we can, it appears that once the trial court delineated the manner in which Beauchamp would be subject to cross-examination and the limitations placed upon Beauchamp's counsel in commenting on the fact of his testifying as contrasted with the failure of the remaining five defendants to testify, it appears that the arrangement completely satisfied the objections made and the trial court was not faced with a final definite motion for severance. Nevertheless, even though such motions were made and denied by the trial court, we think no prejudicial error resulted by reason of the manner in which it was handled by the trial court.

In a case decided by this court, de-Luna v. United States, 5 Cir., 1962, 308

F.2d 140, this court had to deal with a case in which one of two co-defendants determined that he would take the witness stand, although his co-defendant elected to remain silent. The one who took the witness stand undertook to capitalize on the fact that he "was honest enough and had courage enough to take the stand and subject himself to cross examination, and tell you the whole story . . . You haven't heard a word from this man [the other defendant]." On three occasions during counsel's argument, this same theme was stressed by counsel for the witness. Under such circumstances, this court held that it was impossible for the trial court to erase from the jury's mind this damaging contrast between the "honest witness" who took the stand, and the silent witnesses who were thus cast in the role of being unwilling to tell the truth, and the court reversed the conviction of the non-testifying witness.

■ In the present case the trial court, after discussion with all counsel, made it plain that in argument to the jury, Beauchamp's testifying could not be contrasted to the failure of the other defendants to testify. The rights of the other defendants were adequately protected in this manner, and they do not have the complaint that caused the court in *deLuna* to reverse the conviction of the non-testifying witness.

However, in the present case Beauchamp's counsel objects to the proposition that he was unduly restricted in his argument to the jury. He does not dispute the well established proposition that there could be no comment or argument about a defendant's failure to take the stand. Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84. In fact appellant Beauchamp's brief states: "The defendant Beauchamp does not argue against the reasonableness of the limitation placed upon him which prohibited him from making direct comments concerning his co-defendants' failure to take the witness stand." He argues that "he was denied the opportunity to draw reason-

able inferences from the fact that he did testify in his own behalf, and he contends that said denial resulted in prejudice to his case. Defendant Beauchamp was denied the opportunity to make full comment upon the evidence as a result of the district court's imposition of stringent requirements and limitations which prevented him from effectively confronting the jury with the argument that he did exercise his right to take the stand."

■ As we read the record, following considerable colloquy, the trial court's limitations made it permissible for counsel to argue to the jury that Beauchamp testified as a witness and they were to be the judges of his demeanor and the truth or falsity of his testimony as a witness. The court merely prohibited counsel from drawing any contrast between Beauchamp's giving testimony and the other defendants failing to do so. We conclude that this fully meets the requirements that the rights of the co-defendants must be balanced by the court in such a situation as this.

■ Counsel for Brinson, Corbett and Kline complain that their clients' prosecutions were not separated because, once Beauchamp took the stand, they could not honestly cross-examine him lest he be compelled, in order to protect his own interest, to testify in a manner which counsel for the other defendants felt would be giving false testimony. The simplest answer to this is that, as we read this record, we find nothing stated by Beauchamp which in any way inculpates the named defendants. It merely claimed that he was travelling as an innocent passenger on this venture, but he did not make any effort in his testimony to point the finger of blame at either Brinson, Corbett or Kline. Thus no harm could result from the inability of their counsel to cross-examine Beauchamp under the existing ground rules laid down by the court.

■ Touching on the further ground for appeal, that is that the evidence showed entrapment as a matter of law,

we conclude that this cannot be seriously made. The issue was squarely presented to the jury and was rejected.

Among other contentions made by the appellants is the claim that they were improperly sentenced under the statute which was in effect at the time of the commission of their offense, 21 U.S.C.A. § 173 and § 174, which provided for a five year mandatory minimum prison term; whereas, effective May 1, 1971, the New Comprehensive Drug Abuse, Prevention and Control Act abolished the minimum mandatory sentence and generally liberalized the penalty provisions, in most instances no longer forbidding suspended sentences, parole or probation. The offense here proved to the satisfaction of the jury occurred prior to the effective date, May 1, 1971, of the new law. However, the trial and sentencing occurred subsequent to May 1, 1971. Appellants contend that they should have been sentenced under the terms of the new law, notwithstanding the general savings statute, 1 U.S.C.A. § 109, which reads as follows:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."

They contend also that sentencing under the later act is not forbidden by the specific saving provision of Section 1103(a) of the 1970 Act, which provides as follows:

"Prosecutions for any violations of law occurring prior to the effective date of Section 1101, shall not be affected by the repeals or amendments made by such section or section 1102, or abated by reason thereof."

Appellants rely upon the recent case of United States v. Stephens, 9 Cir., 1971, 449 F.2d 103, which involved a somewhat similar chronological sequence, and in which the defendants were prosecuted and convicted for violations of 21 U.S.C.A. § 176a, (a section that was repealed by the 1970 Act), and a few days after May 1, 1971, the effective date of the new act, were sentenced to five year sentences, the minimum prescribed by Section 176a, but they then received suspension of the sentences and each of them was placed on probation for five years. The Court of Appeals for the Ninth Circuit denying mandamus against the trial judge, held that the suspension of sentence and the grant of probation were authorized by the terms of the 1970 Act. The court concluded, after examining the specific and general statutory saving provision that neither preserved the section of the old law which prohibited the granting of probation.

In the meantime, other circuits have decided the case differently. The Court of Appeals for the Second Circuit in United States v. Fiotto et al., 2 Cir., 1972, 454 F.2d 252, and the First Circuit in United States of America v. Bradley et al., 1 Cir., 1972, 455 F.2d 1181, held that all sentencing procedures and the time and limitations contained in the repealed sections dealing with convictions for the violations of these narcotic statutes were controlled by the old statute. The Supreme Court denied certiorari in Fiotto, 406 U.S. 918, 92 S. Ct. 1769, 32 L.Ed.2d 117, but granted certiorari in Bradley, 407 U.S. 908, 92 S. Ct. 2438, 32 L.Ed.2d 682. It thus appears that the Supreme Court is going to give consideration to this precise question.

A perusal of the record indicates that only one of the defendants here received the mandatory minimum sentence of five years, defendant Corbett. Since all of the other defendants received more than the minimum mandatory sentence, it would appear that only Corbett might possibly have been prejudiced if the trial court had the opportunity to give him something less by way of sentence than

the old, now repealed, minimum mandatory five years.

We conclude that we can protect Corbett's interest and still dispose of the case on the merits by affirming the convictions of all of the defendants and affirming the sentences of all, including Corbett's. It is clear that in the event the Supreme Court should reverse the decision of the First and Second Circuits and hold that he was entitled to have been sentenced under the new law, assuming that he has applied for certiorari in this case, the trial court will have the statutory period to modify the sentence after a final disposition of the case on appeal. We have no doubt that the district court will then consider the case as if it were before it *ab initio*, if the Supreme Court should decide that the sentencing choices of the district court are to be made under the 1970 Act.

We have considered each of the other contentions made on appeal, and find them without merit.

The judgments are affirmed.