STATE of Iowa, Appellee,

v.

Leo M. BAKER, Appellant.

No. 62639.

Supreme Court of Iowa.

June 18, 1980.

John P. Roehrick, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Lona Hansen, Asst. Atty. Gen., and David H. Correll, Black Hawk County Atty., for appellee.

Considered by REYNOLDSON, C. J., and REES, UHLENHOPP, ALLBEE, and McGIVERIN, JJ.

REYNOLDSON, Chief Justice.

Defendant lawyer was charged with violating section 713.6, The Code 1977[1] ("Fraudulent conveyances"). He was convicted following trial to the court and now appeals. We affirm.

The facts developed upon this trial were similar to those submitted in defendant's disciplinary proceeding. *See Committee on Professional Ethics and Conduct v. Baker*, 269 N.W.2d 463 (Iowa 1978).

Defendant and W. W. Sindlinger were lawyers who formed a professional corporation which in turn was a partner in a Waterloo law firm. They, together with Wayne Mark, a realtor, owned Vi-Vim, Inc., a corporation formed to take title to real estate in order to conceal the identity of the equitable owners. These three persons formed a "Vi-Vim" partnership on September 1, 1973, through which they held the equitable ownership, in varying shares, in several real estate tracts. Two of these parcels were identified as the "Degener property" and the "Howard property." The conduct of the three partners in the acquisition and sale of the "Miller Farm" formed the basis of this action.

Nettie Miller owned the full interest in this 278.5-acre farm except for a one-seventh interest in 190 acres which was owned by several grandchildren of a deceased sister. Nettie had been under conservatorship since 1968, with Sindlinger and Audrey Zeiger, a niece, serving as co-conservators. Commencing in 1969 Nettie was so senile

1. This statute, since repealed, stated:

713.6 Fraudulent conveyances. Any person who, knowingly being a party to any conveyance or assignment of any estate or interest in lands, goods, or things in action, or of any rents or profits arising therefrom, or being a party to any charge on such estate, interest, rents, or profits, made or created with intent to defraud prior or subsequent purchasers, or to hinder, delay, or defraud creditors or other persons, and every person who, being privy to or knowing of such fraudulent conveyance, assignment, or charge, puts the same in use as having been made in good faith, shall be imprisoned in the penitentiary not exceeding three years, or may be fined in the discretion of the court not exceeding one thousand dollars, or imprisoned in the county jail not more than one year.

she could no longer live alone. She became a nursing home patient and gradually deteriorated both mentally and physically until her death at age 95 on December 17, 1975. In 1973 Wayne Mark, through Sindlinger, made a $140,000 offer to buy the Miller farm. Sindlinger wrote Zeiger the offer appeared to have "definite advantages" and she ought to give it serious consideration. Zeiger rejected this offer because she did not trust Mark and because it was too low. During all this time the farm was being rented for an unreasonably low cash rent.

Nonetheless, under Sindlinger's lead, Zeiger did consent that the farm should be sold. Sindlinger proceeded to procure deeds to Zeiger from the other fractional owners to facilitate an ultimate sale. He wrote one of these owners that she could be "assured that the people back here, that is, Nettie Miller and Audrey Zeiger who own by far the most substantial interest in the farm, will do everything they can to get the best price." At that time Nettie was senile and Zeiger was unsophisticated in the area of farm prices.

Subsequently, Mark and Sindlinger agreed to a joint purchase of the farm. In May 1975 Sindlinger asked defendant if he would like to participate. Defendant testified he agreed although he did not recall that he then was told who owned the farm, the price, or other relevant information. Later Sindlinger told defendant the owner did not want to sell to Mark and a straw man would be required. Defendant in the same month procured Richard Doerfer, a client and friend who officed in the same building.

July 2, 1975, after Sindlinger had relayed an oral offer of $200,000 which was rejected, he mailed Zeiger a written $250,000 offer, purportedly from Doerfer, which she accepted. Defendant procured Doerfer's signature on this contract, which was subject to the court's approval. Defendant testified he did not read the contract and therefore did not see that it involved a conservatorship. Upon cross-examination he testified he told Doerfer that the latter would be acting as straw man for him and Sindlinger, and that at the time Doerfer signed defendant knew the farm described was the one in which he and Sindlinger were acquiring an interest.

Later defendant signed a termination notice which was served on the farm tenant on August 20, 1975. Within 24 hours a farm neighbor, George Isley, called defendant and asked if the farm was for sale. Although the offer and acceptance were subject to court approval, defendant said he would return the call. In a day or so defendant telephoned Isley and reported the farm had been sold. He did not inquire what Isley would pay for the farm.

November 19, 1975, Sindlinger as co-conservator successfully petitioned district court for permission to sell the farm pursuant to the offer, without appraisal. The district court judge testified at this trial that he had not been told who really was buying the farm and would not have approved the sale had he known the truth. Defendant borrowed $50,000 to provide the down payment, which sum ultimately was used for that purpose.

Nettie died on December 17, 1975, before the sales contract was signed by Doerfer and before sale could be consummated through the conservatorship. Defendant testified it was not until the next day that "I am confident that I was aware" that there was a conservatorship involved; that it was the first time he had "clear cut knowledge" the farm they had purchased "was one from a client and [we] had failed to disclose that we were the purchasers." On cross-examination he admitted he knew prior to December that there was an "ethical problem." The final report in the conservatorship, filed by Sindlinger and Zeiger as co-conservators, alleged the proposed sale of real estate, approved December 12, 1975, in fact had never been consummated because the ward died before the proposed purchaser had executed the contract, "and said sale was therefore abandoned by this Conservatorship." Defendant testified that after Nettie's death he and Sindlinger discussed "that the contract should be processed through the estate."

December 18, 1975, Zeiger executed a petition to probate Nettie's will and to appoint an executor. Zeiger was appointed pursuant to the terms of decedent's will. Defendant's firm was designated as attorney. Nettie's interest in the farm was scheduled on the probate inventory at a value of $224,875.75 with the notation, "Value determined by sale being negotiated prior to decedent's death and consummated January 15, 1976, by Executor, under power of sale in decedent's will." Of course the value shown was arrived at by a pro rata elimination of the outstanding one-seventh interest in the 190 acres.

A "Uniform Real Estate Contract" dated January 15, 1976, was executed between Zeiger as executor of the estate of Nettie M. Miller as seller, and R. E. Doerfer as buyer, for a total of $224,875.75 for the estate's interest in the farm.

At trial a prosecution appraiser valued the Miller farm at $416,500 ($1495 per acre) on July 1, 1975, and $470,600 ($1687 per acre) on January 15, 1976. Valuations by several neighbors were higher. Through defendant's sophisticated sales technique, the farm was sold through the straw man Doerfer to a neighboring property owner, Vernon Luhring, for $724,100 (about $2600 per acre) on October 8, 1976. Defendant received the purchase price checks made payable to Doerfer, endorsed them as his attorney, and ran them through a "Doerfer" trust account. This sale resulted in a gain of nearly $500,000 in less than one year.

Defendant had purchased and sold real estate, and had practiced extensively in probate and farm incorporating. Contrary to defendant's contentions, trial court found him to be "very knowledgeable concerning farm values."

Attorney LeRoy Redfern examined the abstract for the purchaser Luhring. After he required the contract rather than a memorandum of purchase to be recorded, he noted the low $897.66 per acre sale price to Doerfer and knew Doerfer officed with defendant's law firm and was defendant's personal friend and client. He believed there had been an ethical violation and told defendant and Sindlinger he was going to file a complaint with the ethics committee. Defendant attempted to justify the Doerfer sale price; at a subsequent meeting he no longer sought to justify the price but sought to enlist Redfern's participation in lowering Luhring's purchase price as though he had purchased at the time of the purported Doerfer sale, indicating the excess over the Doerfer sale price would go to the "heirs."

Redfern filed a complaint with the Black Hawk County Bar Association Ethics and Grievance Committee. Baker and Sindlinger voluntarily appeared before the county committee. They admitted they and Mark were the actual purchasers and that Doerfer was a straw man. Their recorded testimony was admitted into evidence in the trial of this case over defendant's objections. Defendant contended his testimony was privileged under Iowa Sup.Ct.R. 118.18 (now 118.19) because counsel for the Committee on Professional Ethics and Conduct of the Iowa State Bar Association had requested that the testimony be taken and a transcript forwarded to the committee.

Restitution of the profit on the Luhring sale was made to Nettie's estate.

In this appeal defendant raises three broad contentions. First, he asserts trial court erred in overruling his motion to dismiss because the facts do not disclose a fraudulent conveyance in that neither Nettie Miller (the original owner of the property) nor her heirs were protected parties under the statute. Second, defendant argues trial court erred in admitting into evidence certain acts and declarations of defendant's law partner and business associate, W. W. Sindlinger, under the co-conspirator exception to the hearsay rule when the State failed to introduce preponderant independent evidence of the conspiracy's existence, and in any event such acts and declarations were pre-conspiratorial. Third, defendant alleges trial court wrongly admitted into evidence the transcript of the Black Hawk County Bar Association Ethics and Grievance Committee proceeding,

claiming it was privileged under Iowa Sup. Ct.R. 118.18 (now 118.19).

I. *Applicability of section 713.6, The Code 1977 (repealed), in this situation.*

A. *Statutory history.*

The language of section 713.6, The Code 1977 (repealed), under which defendant was charged, is essentially unchanged from a predecessor statute, section 2745, The Code 1851. That statute was in turn based on an ancient English law, An Act Against Fraudulent Deeds, Alienations & c., 1570, 13 Eliz. I, c. 5. The English enactment obviously was designed not only to "avoid and abolish" feigned conveyances contrived of malice, fraud and collusion intended "to delay, hinder or defraud creditors and others of their just and lawful actions," but also to bar any transactions which went against "all true and plain dealing [and] bargaining." Every party to such a "covinous" (*i. e.,* deceitful) or fraudulent grant or conveyance, and anyone "being privy and knowing of the same" who wittingly and willingly put the same in use was subject to criminal penalties. Among the "others" protected were those entitled to "heriots" and "mortuaries," tributes payable on death.

Section 713.6, The Code 1977 (repealed), can be read to provide,

Any person who, knowingly being a party to any conveyance . . . of any estate or interest in lands . . . made or created with intent . . . to . . . defraud creditors or other persons, and every person who, being privy to or knowing of such fraudulent conveyance, . . . puts the same in use as having been made in good faith, shall be imprisoned . . . or may be fined . . . .

We may agree with defendant that this enactment is so similar to the original English enactment that it is logical to attribute similar intents to the legislative bodies. *See generally* 2A A. Sutherland, *Statutes and Statutory Construction* § 52.02 (4th ed. C. Sands 1973). It is also plain from the language of the English statute that it was formulated to nullify fraudulent conveyances as well as penalize participating parties, and that persons other than creditors were protected.

■ And we also recognize the principle that if the language of a statute is plain, unambiguous, and consistent with related statutory provisions, no duty of interpretation arises and there is no occasion to probe for legislative intent. *Spilman v. Board of Directors,* 253 N.W.2d 593, 596 (Iowa 1977); *First National Bank of Ottumwa v. Bair,* 252 N.W.2d 723, 725 (Iowa 1977); *State v. Dunham,* 232 N.W.2d 475, 476 (Iowa 1975).

Former section 713.6 traces into present section 714.1(3), The Code 1979 ("Theft defined") which relevantly provides that a theft is committed when a person "[o]btains . . . a transfer of possession, control, or ownership of the property of another . . . by deception." *See* J. Roehrick, *The New Iowa Criminal Code: A Comparison* 124–25, 127 (1977) ("Except for the notations [not applicable], no change in the prior law is foreseen. Thus refer to existing case law and *Uniform Jury Instructions* 509.1–6.").

B. *Merits of defendant's contentions.*

Defendant argues that the "common thread" connecting the Elizabethan statute with its counterparts in America is the protection of creditors from a debtor's wrongful conveyance to avoid debts. He asserts the "other persons" language of section 713.6 refers to claimants against the *grantor,* and although the language is broad enough to cover contingent debts, it cannot be expanded to include heirs. Defendant further argues the intent to defraud must be in the mind of the grantor before a grantee can be held liable on the ground the latter had knowledge of the fraudulent conveyance. He reasons that because Zeiger as executor was the innocent grantor and had no intent to defraud, he, as a party to the conveyance, is absolved from criminal liability. We are not so persuaded.

In an early Iowa decision, this court, in referring to a predecessor to section 713.6, stated,

The words "other persons" must be construed to mean *some one who had, or might have, a claim or right to the property conveyed, which might be enforced at law or equity. . . .* The statute must have a practical and legal application. It was not the intent the statute should be regarded in the light of a moral code, and operate on the conscience of the party making the conveyance, but *its purpose is to protect the legal or equitable rights of others.*

.    .    .    .    .

If the plaintiff had been indicted under the statute, he could not have been convicted unless it could have been established there were creditors, *or that the conveyance was made to defraud some person who had or might have a claim or right to the property conveyed.*

*Day v. Lown*, 51 Iowa 364, 369–70, 1 N.W. 786, 790–91 (1879) (emphasis added and citations omitted). In *State v. McGee*, 200 Iowa 329, 332, 204 N.W. 408, 409 (1925), we said the purpose of the predecessor statute "was to protect the legal or equitable rights of others. It must be given a practical application."

■ We thus turn to an examination of the evidence in this case in the light most favorable to the State. Our inquiry is whether, after viewing all the evidence in that light, any rational fact finder could have found the contested essential elements of the crime beyond a reasonable doubt. *See State v. Robinson*, 288 N.W.2d 337, 339–40 (Iowa 1980). More specifically, we must determine whether under that criterion the evidence justifies a finding there was a fraudulent conveyance, and if Nettie Miller's beneficiaries, who included Zeiger, were "other persons" who had, or might have, "a claim or right to the property conveyed." *Day*, 51 Iowa at 369–70, 1 N.W. at 791.

We hold trial court was right in analyzing defendant's criminal responsibility in light of the January 15, 1976, Zeiger-to-Doerfer real estate contract. Defendant agreed with Sindlinger that the prior transaction should be abandoned and that the contract should be processed as a sale out of the estate. This contract was a conveyance transferring the equitable title, *McCreary v. McGregor*, 183 Iowa 732, 737, 167 N.W. 633, 634 (1918), and was so represented by defendant in the subsequent sale from the straw man Doerfer to Luhring. The Zeiger-to-Doerfer contract appears in the Miller farm abstract as a vital link in the chain of title.

Trial court rationally could have found beyond a reasonable doubt this conveyance was fraudulent as to Zeiger and the other beneficiaries of Nettie's will on not less than two of the grounds trial court relied on: (1) a misrepresentation as to the true identity of the purchasers of the property (there is no dispute Zeiger never would have sold to Mark) and (2) a misrepresentation as to the value of the property and the price for which it could be sold. *See Pacific Royalty Co. v. Williams*, 227 F.2d 49, 56 (10th Cir. 1955), *cert. denied*, 351 U.S. 951, 76 S.Ct. 847, 100 L.Ed. 1474 (1956). At least from the date of Nettie's death, defendant helped to conceal the true nature of the sale and the true value of the farm from Zeiger and her co-beneficiaries of Nettie's estate, and from the court.

We pass to question whether trial court could have found these beneficiaries were persons who, under *Day*, "had or might have a claim or right to the property conveyed." Under Nettie's will, title to the Miller farm passed to the residuary beneficiaries subject to the right of Zeiger as executor to sell the property during the probate proceedings. *See DeLong v. Scott*, 217 N.W.2d 635, 637 (Iowa 1974). We think they had sufficient remaining claim or interest in the property for section 713.6 purposes when its sale was fraudulent as to them. Even though the executor's power of sale under the will may have effected an equitable conversion of the property as to the beneficiaries for distribution purposes, *Newbury v. McCammant*, 182 N.W.2d 147, 150–51 (Iowa 1970); § 633.384, The Code, the charge nonetheless would lie because section 713.6 includes conveyances of both real and personal property. *See In re Jur-*

*gensmeier's Estate*, 142 Neb. 188, 200–01, 5 N.W.2d 233, 240 (1942); *Heyl v. Goelz*, 97 Wis. 327, 72 N.W. 626 (1897).

We hold trial court committed no error in rejecting the legal argument that there was no fraudulent conveyance because Zeiger had no fraudulent intent. She was 71 years old on the date of the Doerfer contract, and had retired from school teaching in 1971. She admitted she did not know how much money was in the conservatorship "since Mr. Sindlinger took care of all of this." She further testified she did not know enough about a farm to manage it. She demonstrated no knowledge of farm values, except she later opined the Doerfer sale had been too cheap. As grantor in the fraudulent conveyance, Zeiger was an innocent though malleable tool for defendant and Sindlinger. Although they and Mark provided the fraudulent intent for both the unwitting seller and undisclosed buyers, we find no language in section 713.6 which requires the fraudulent intent to be in the grantor, and we impose no such requirement here.

There was abundant evidence to support trial court's finding that defendant was a party (as undisclosed purchaser) to a fraudulent conveyance, and further, that he put the same "in use as having been made in good faith." *See* § 713.6, The Code 1977 (repealed).

We have examined the authorities cited in defendant's brief, and find none are similar factually and all are inapposite. On the other hand, in *Leonardo v. Leonardo*, 251 F.2d 22 (D.C. Cir. 1958), the federal court held a common-law wife's inchoate right of dower was an interest in property and the wife was among the protected "other persons" in a statute springing from 13 Eliz. I, c. 5. The interests of these beneficiaries surely were entitled to the same protection.

Trial court rightly determined that section 713.6 is applicable in this situation.

II. *Admissibility of Sindlinger's prior acts and declarations over defendant's hearsay objections.*

Defendant objected to the introduction of certain evidence showing that he, Sindling-er and Mark were speculating with other real estate, Sindlinger's early efforts to assist Mark in acquiring the Miller farm at a cheap price, and Sindlinger's later efforts to reassure the other owners concerning the sale price. Defendant asserts these acts and declarations were hearsay as to him, were admissible only under the "co-conspirator exception" to the hearsay rule, and that ultimately there was no proof the conspiracy then existed. He thus asserts this evidence should have been rejected by trial court.

■ Regardless of trial court's preliminary reasons for admitting this evidence, if the hearsay rule can be found inapplicable under any theory, the ruling will be upheld. *State v. Leonard*, 243 N.W.2d 887, 890 (Iowa 1976); *State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976); *State v. Hinkle*, 229 N.W.2d 744, 748 (Iowa 1975) ("there is no reversible error if trial court's ruling which admitted the evidence in controversy may be sustained on any ground").

■ Without further extending this opinion by analyzing each objection, we find the testimony and exhibits disclosing the acts of Sindlinger and Mark with reference to the Miller farm, and the activities of these persons and defendant in other real estate speculation, were relevant evidence (without reference to the truth of specific assertions made), reasonably necessary to complete the whole story of the crime charged, *Leonard*, 243 N.W.2d at 890–91, to prove the intent, purpose and aim of the persons who later conspired, and as bearing on the issue of the existence of the ultimate conspiracy. Thus it was admissible not under the co-conspirator exception, but simply because it did not fall within the definition of hearsay. *See State v. Moritz*, 293 N.W.2d 235, 243 (Iowa 1980); *State v. Jones*, 271 N.W.2d 761, 767 (Iowa 1978); *State v. Rush*, 242 N.W.2d 313, 319 (Iowa 1976) ("The distinction between statements offered to prove the truth of a matter asserted and those offered to prove only (1) the fact such statements were made or (2) their effect on the subsequent actions of the hearer, has been recognized by this court.").

Admissibility of such evidence is strongly supported by decisions from other jurisdictions. *See United States v. Hickey*, 360 F.2d 127, 140 (7th Cir.), *cert. denied*, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966):

> Furthermore, events which occur prior to the commission of a crime are often relevant to an understanding of the nature of the crime itself. . . . Here we do not think that the district judge erred by admitting evidence of the continuing series of transactions relating to the purchase of the Hartman farm. The earlier negotiations merged with acts done in furtherance of the conspiracy and were relevant to an understanding of them. They were admissible against all the conspirators once a prima facie conspiracy was proved. Kearns, who may have entered the conspiracy at a later date, took the conspiracy as he found it.

*See also United States v. Testa*, 548 F.2d 847, 851 (9th Cir. 1977) ("[A]cts by others (and statements by others, if not offered for the truth) before or after the conspiracy may be relevant in suggesting the existence and aims of the conspiracy charged."); *United States v. Cioffi*, 493 F.2d 1111, 1115 (2d Cir.), *cert. denied*, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974) (evidence of events prior to the conspiracy admissible to prove the intent, purpose and aim of the parties to the conspiracy); *United States v. Milisci*, 465 F.2d 700, 703 (5th Cir.), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 684, 34 L.Ed.2d 664 (1972) (activities of the person who perfected the conspiracy could be shown even though those activities occurred prior to the date the conspiracy was actually formed); *Commonwealth v. Borans*, —— Mass. ——, ——, 393 N.E.2d 911, 929 (1979) (acts and transactions prior to the alleged date of the commencement of the conspiracy are relevant as bearing upon the fact of the conspiracy itself).

There was sufficient evidence to permit an inference by trial court that Sindlinger and Mark later conspired to acquire the Miller farm and defraud its owners, whether the "substantial evidence" test, *Kidd*, 239 N.W.2d at 864, or the "prima facie" test,

*State v. Blyth*, 226 N.W.2d 250, 270 (Iowa 1975), is utilized. *See State v. Thompson*, 273 Minn. 1, 15–18, 139 N.W.2d 490, 502–04, *cert. denied*, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966).

The challenged evidence of acts and transactions during that conspiracy and prior to Nettie's death was admissible against defendant under the general rule: "Acts or declarations of conspirators, done or made before the accused joined the conspiracy, are adopted by him so as to be admissible against him." 22A C.J.S. *Criminal Law* § 765 (1961). *See United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746, 765 (1948); *United States v. Sarno*, 456 F.2d 875, 878 (1st Cir. 1972); *Jordan v. United States*, 428 F.2d 7, 10 (9th Cir.), *cert. denied*, 400 U.S. 946, 91 S.Ct. 252, 27 L.Ed.2d 252 (1970).

We hold trial court did not err in admitting this evidence and considering it as indicated in the judgment he entered.

III. *Admissibility of grievance committee transcript.*

■ Defendant finally contends trial court reversibly erred in admitting into evidence the transcript of the Black Hawk County Bar Association Ethics and Grievance Committee proceeding. He asserts such testimony was protected by the immunity provision of Iowa Sup.Ct.R. 118.18 (now 118.19).

Rule 118.19 provides in relevant part, "Complaints submitted to the grievance commission or testimony with respect thereto shall be privileged and no lawsuit predicated thereon may be instituted." The body referred to in rule 118.19 is "the Grievance Commission of the Supreme Court of Iowa whose members shall be the Committee on Grievances of the Iowa State Bar Association and their successors as confirmed by order of this court." Iowa Sup. Ct.R. 118.1.

On April 25, 1977, Redfern met with Baker and Sindlinger and delivered to each a copy of the report he proposed to file with the Black Hawk County Bar Association Ethics and Grievance Committee. At that

time he still thought Doerfer was the actual purchaser of the Miller farm. Neither defendant nor Sindlinger had any corrections and both indicated the complaint was either accurate or fair, although the two offered to make a "full disclosure" to him. Redfern delivered it to the chairman of the local ethics committee.

The Black Hawk committee met April 27, 1977. A transcript of that meeting is the controverted State's exhibit 89, produced under subpoena directed to counsel for the Committee on Professional Ethics and Conduct of the Iowa State Bar Association. Defendant and Sindlinger were present and represented by their then counsel. The chairman noted the meeting was at the request of defendant and Sindlinger. Their counsel agreed, stating they would "tell the story" and that it was his understanding, through the administrator for the Committee on Professional Ethics and Conduct of the Iowa State Bar Association, that the transcript would be submitted to the state committee which would "then ship it on to the Grievance Committee [sic] for their recommendation, which in turn will be forwarded to the Supreme Court." Defendant and Sindlinger were cautioned that there was a possibility of criminal proceedings, that they were not required to make statements or answer questions, and that anything they said could be used against them. Defendant and Sindlinger were informed that a copy of the Redfern complaint already had been furnished to the county attorney. Counsel for Sindlinger and defendant expressed the opinion that no criminal action could be prosecuted because of Iowa Sup.Ct.R. 118.18 (now 118.19), a conclusion that was questioned by several committee members.

Sindlinger and defendant then revealed to the committee that Doerfer was not the real purchaser of the Miller farm but was the straw man for Mark, Sindlinger and the defendant. It was defendant's recollection that in May of 1975 Sindlinger proposed that he, Mark and defendant buy the "Nettie Miller farm," an unfamiliar tract to him. He further stated,

I would also presume, based upon the chronological events, although I do not have a specific recollection of this, that there must have been some discussion about, "Well, we can't let them know that Wayne [Mark] is going to buy it," and I'm reasonably sure that I'm probably the one that said, "Let's have Doerfer buy it," because I had a rather close relationship with Dick Doerfer.

The transcript, identified by the Black Hawk committee chairman, was offered at defendant's trial. Defendant's objections of privilege and denial of due process and fifth amendment rights were overruled.

We hold trial court's ruling was correct. The intent and purpose of rule 118.19 (entitled "Immunity") is to protect complainants, witnesses, members of the grievance commission, members of the committee on professional ethics and conduct and their respective staffs from retaliatory litigation by investigated lawyers, not to protect lawyers from prosecution for criminal offenses. In the interest of protecting the public from unethical practices, persons should not be dissuaded from filing complaints by threats of defamation suits or other litigation. *Wong v. Schorr*, 51 Hawaii 608, 609, 466 P. 2d 441, 442 (1970). The rules of procedure of the professional ethics and conduct committee which make its files confidential (except to the lawyer complained against) were designed to strike a proper balance between an attorney's protection from defamation and the public's protection from unethical conduct. *Id. Accord, People v. Pacheco,* —— Colo. ——, (1980) (holding that a district attorney may obtain access to the files of a bar grievance committee for use in an ongoing investigation, and subsequent prosecution, so long as the information requested relates to the charges being investigated). Those provisions and the provisions of Iowa Sup.Ct.R. 118.7, which make confidential the proceedings and hearings before the grievance commission, were not intended to place evidence of a lawyer's criminal conduct beyond the reach of legal process emanating from a criminal proceeding.

Were an attorney to be so insulated, there would be no necessity for him or her to claim the fifth amendment privilege, or for our rule recognizing and articulating the investigated lawyer's right not to answer if the response would be self-incriminatory. Iowa Sup.Ct.R. 118.6.

Our rules do not confront a lawyer with the Hobson's choice of answering or disbarment, the practice struck down by the United States Supreme Court in *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). *See also Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Defendant has cited no instance of our utilization of those grounds in this or any other disciplinary proceeding. Violation of his fifth amendment rights was not a viable objection to the offer of exhibit 89.

Adoption of the evidentiary privilege defendant claims would require members of the grievance commission and committee on professional ethics and conduct, and staff, possessing evidence of serious criminal conduct of an investigated lawyer, to shield that information from law enforcement authorities, a potential violation of the Iowa Code of Professional Responsibility for Lawyers, DR 1–103(A) and (B). It would lead to absurd results, for in our decision in the disciplinary proceeding such evidence likely would be set out in detail. *See, e. g., Committee on Professional Ethics and Conduct v. Baker*, 269 N.W.2d at 464–65.

Defendant was not denied his fifth amendment privilege. He was forewarned his statements might be used in a subsequent criminal proceeding. Trial court was right in overruling his objections to the transcript, exhibit 89.

The judgment entered in this case is affirmed.

AFFIRMED.